STATE BANK OF STANDISH v CURRY

Docket No. 92311. Argued November 10, 1992 (Calendar No. 6). Decided April 13, 1993.

The State Bank of Standish brought an action for claim and delivery in the Iosco Circuit Court against Robert N. Curry and Kathleen Curry for collection of an outstanding promissory note following the Currys' default. The Currys counterclaimed, alleging damages arising from breach by the bank of a promise to make a loan for their spring planting, asserting theories of promissory estoppel, fraud, duress, and breach by the bank of the duty of good faith and fair dealing. The court, J. Richard Ernst, J., granted summary disposition for the bank on all counterclaims except promissory estoppel, and found no defense to the bank's claim and delivery action. After trial, the jury returned a special verdict that the bank had made a clear and definite promise to loan money to the defendants and that they had justifiably relied on that promise to their detriment. The Court of Appeals, Neff, P.J., and Shepherd and McDonald, JJ., in an opinion per curiam, reversed the judgment for the defendants on the promissory estoppel claim and affirmed summary disposition for the bank (Docket No. 111575). The defendants appeal.

In an opinion by Justice Boyle, joined by Chief Justice Cavanagh, and Justices Levin, Brickley, and Mallett, the Supreme Court held:

There was sufficient evidence of a clear and definite promise to support a claim for relief on the theory of promissory estoppel.

1. Promissory estoppel protects the ability of individuals to trust promises in circumstances where trust is essential. The value of trust forms the basis of the entitlement to rely. The interest protected is reasonable reliance; reliance is reasonable only if induced by an actual promise. To invoke the doctrine, a court must undertake a threshold inquiry into the circum-

REFERENCES

Am Jur 2d, Contracts § 120; Estoppel and Waiver § 48.

Vendor's action against vendee's prospective lender for misrepresentation respecting or failure to complete loan commitment. 30 ALR4th 474.

stances surrounding both the making of the promise and the promisee's reliance as a question of law. The existence and scope of the promise are questions of fact. A determination that a promise exists will not be overturned unless clearly erroneous.

2. A promise may be stated in words, either orally or in writing, or may be inferred in whole or in part from conduct. Language and conduct must be understood in light of the circumstances, including course of performance, course of dealing, and usage of trade. A promise also must be distinguished from statements of opinion or predictions of future events. An objective standard determines whether a commitment was voluntarily made. For a promise to loan money in the future to be sufficiently clear and definite, some evidence must exist of the material terms of the loan, including the amount of the loan, the interest rate, and the method of repayment.

3. In this case, the evidence, viewed in a light most favorable to the defendants, showed that they were not in default on their outstanding loan when the bank stated that it would continue to support the defendants' farm as it had in the past, although it would not guarantee such support for the following year. Objectively viewed, the jury was entitled to find that these were not merely words of assurance or a statement of belief, but were a promise of future action. Thus, the trial court did not err in leaving the question of the existence of a clear and definite promise to the jury where it could have found from the evidence that the bank had promised to make the loan, the terms of which could be objectively determined.

Affirmed in part, reversed in part, and remanded.

Justice RILEY, joined by Justice GRIFFIN, dissenting, stated that the bank's statements were not clear and definite promises necessary for the application of promissory estoppel.

For a promise to loan money in the future to be sufficiently clear and definite, some evidence must exist of the material terms of the loan, including the amount of the loan, the interest rate, and the method of repayment. In this case, the alleged promise was so ambiguous as to bar the application of promissory estoppel. No terms of the loan were specified, and the statements of support were not formal agreements with merely some terms to be decided. The quickly souring financial circumstances of the defendants significantly altered any established customary norms between the parties. Clearly the terms and approval of the annual loans were not fixed, but subject to annual renegotiation.

190 Mich App 616; 476 NW2d 635 (1991) affirmed in part and reversed in part.

1. CONTRACTS — PROMISSORY ESTOPPEL — REASONABLE RELIANCE —
   QUESTIONS OF LAW AND FACT.

   Promissory estoppel protects reasonable reliance, induced by an
   actual promise; to invoke the doctrine, a court must undertake
   a threshold inquiry into the circumstances surrounding both
   the making of the promise and the promisee's reliance as a
   question of law; the existence and scope of the promise are
   questions of fact, and a determination that a promise exists will
   not be overturned unless clearly erroneous.

2. CONTRACTS — TO LEND MONEY — ORAL PROMISES — INFERENCES
   FROM CONDUCT.

   A promise may be stated in words, either orally or in writing, or
   may be inferred in whole or in part from conduct; such lan-
   guage and conduct must be understood in light of the circum-
   stances, including course of performance, course of dealing, and
   usage of trade, and must be distinguished from statements of
   opinion or predictions of future events; for a promise to loan
   money in the future to be sufficiently clear and definite, some
   evidence must exist of the material terms of the loan, including
   the amount of the loan, the interest rate, and the method of
   repayment.

*Braun, Kendrick, Finkbeiner* (by *Kenneth W. Kable* and *Scott C. Strattard*) for the plaintiff.

*Cubitt, Cubitt & Trowhill* (by *H. Dale Cubitt*) for the defendants.

Amicus Curiae:

*Warner, Norcross & Judd* (by *James H. Breay* and *David E. Kirtley*) and *Howard & Howard Attorneys, P.C.* (by *James H. Geary*), for Michigan Bankers Association.

BOYLE, J. We granted leave in this case to deter-
mine whether there was sufficient evidence of a
clear and definite promise to support a claim for
relief on the theory of promissory estoppel. After
careful review of the record, we find that there
was. Accordingly, we affirm in part and reverse in
part the decision of the Court of Appeals. We

reinstate the jury's verdict in favor of the Currys and remand the case to the trial court for further proceedings consistent with this opinion.

I

Robert and Kathleen Curry are dairy farmers. Beginning in 1975, the Currys annually obtained funds from the State Bank of Standish to purchase seed, fertilizer, and chemicals for spring planting. The sum of the operating loan varied little from year to year and was used solely for the planting of crops. Early each year, Mr. and Mrs. Curry would visit the bank to discuss the upcoming spring loan and crop plan with the bank's officers. The bank would complete the required paperwork and, after the initial visit with the Currys to discuss the loan, simply call the Currys back to the bank in March or April to sign the promissory note. Any outstanding balance on the previous year's loan was rolled over and added into a new loan bearing an interest rate of two points over the bank's prime rate, which was then amortized over a five-year period. Monthly payments were made directly from the Michigan Milk Producers Association (MMPA) by assignment of the proceeds from the Currys' milk contract. As collateral, the bank had a security agreement on all the Currys' personal property, which was, at a minimum, twice the value of the loan.

The federal government, in an attempt to stabilize prices in the dairy market in March 1986, implemented a dairy herd buy-out program.[1] Al-

[1] Farmers participated in the program by submitting bids based on a price per hundred weight of milk. That figure was then multiplied by the volume of milk shipped off the farm. If the bid was accepted by the government, the farmer would receive a lump-sum payment, sell the dairy herd, and not reenter the dairy market for at least five years.

though never in default on any of his loans, Mr. Curry, discouraged by the increasing economic difficulties with dairy farming in the 1980's, seriously considered the program. The buy-out would have afforded him a debt-free termination of his dairy business. In addition to the money received from the government buy-out, the Currys' registered dairy herd could be sold in Canada for a greater amount than those unregistered herds in the program that would be slaughtered.

Mr. and Mrs. Curry went to the bank in January and February of that year with the sole purpose of discussing the government buy-out program to decide whether they should continue in or get out of the dairy farming business. At that time, Mr. Curry brought to the bank a written breakdown of the $20,000 needed for the upcoming spring loan. As usual, the Currys spoke with Mr. Garry, the assistant vice president and loan officer, and were later joined by Mr. Pelts, the executive vice president of the bank. The discussion centered on the current trying economic times and whether the Currys should enter the buy-out program. Mr. Curry testified that in the context of discussing whether he should continue dairy farming or get out of the dairy business, he asked the bank officers whether the bank would continue to support their farm. Mr. Garry and Mr. Pelts responded that the Currys were doing a good job and had made all their payments and that there was no reason to worry about their future in the dairy business because the bank would support them. Believing they had a promise for the upcoming spring loan on the basis of this conversation with bank officers, the Currys continued with their dairy farming operation and did not submit a

serious bid in the government's March 1986 buy-
out program.[2]

In mid-April, Mr. Curry stopped at the bank to
request an additional $5,000 to tile a field and to
inquire about the delay in signing the papers for
the spring operating loan. Although it was now
well into the spring planting season, Mr. Garry
stated that "it would probably be a couple weeks
before he got it all done." Mr. Curry contacted the
bank in May and was informed by Mr. Garry that
the bank would not renew their operating loan for
1986. Mr. Curry sought alternative financing from
an arm of Farm Credit Services, but was told that
he would first have to pay off his existing loan at
the State Bank of Standish because it held all his
personal property as collateral. He was unable to
do so. To acquire the necessary cash to sustain the
dairy operation, the Currys obtained credit from
suppliers and subsequently defaulted on the out-
standing promissory note with the bank. Because
of late planting and necessary cutbacks, the pro-
duction and health of the dairy herd declined.

The bank filed an action for claim and delivery.
The Currys counterclaimed, alleging economic and
emotional damages arising from breach of the
bank's duty of good faith and fair dealing, fraud,
duress, and promissory estoppel. The trial court
granted the bank's motion for summary disposi-
tion pursuant to MCR 2.116(C)(8) on all counter-
claims except promissory estoppel. The court also
found no defense to the bank's claim and delivery

---

[2] Mr. Curry, with the assistance of the farm's nutritionist, Dr. Scott
LaBlond, determined that a competitive bid would be $20 per hun-
dred weight of milk. Using that figure, the Currys' dairy operation
would have been bought out for a sum between $400,000 and
$500,000, affording them a profit of approximately $200,000. However,
relying on the assurances of continued support by the bank, Mr.
Curry submitted a bid of $50 per hundred. The low bid ultimately
accepted by the government was $22.50 per hundred.

action, but stayed judgment until after trial for the purpose of setoff, if any.

At trial, the jury found by special verdict that the bank made a clear and definite promise to loan money to the Currys for their 1986 farm operating needs and that the Currys had justifiably relied on that promise to their detriment. The jury award was set off against the amount due the bank on the promissory note, resulting in a judgment for the Currys of $56,243.44.

On appeal, conceding the facts alleged by the Currys as true, the bank contended that there was no evidence of a clear and definite promise by it to make the loan. The Court of Appeals agreed, 190 Mich App 616; 476 NW2d 635 (1991), reversed the trial court's judgment in favor of the Currys on the promissory estoppel claim, and affirmed the summary disposition on the fraud, duress, and good-faith and fair-dealing claims. We granted leave to appeal. 439 Mich 1021 (1992).

Because we agree with the Court of Appeals regarding summary disposition of the fraud, duress, and good-faith and fair-dealing claims, we address only the promissory estoppel issue. In its brief and at oral argument, the bank conceded reliance and did not raise the issues of consideration or damages. The only issue before us is whether the Court of Appeals correctly found insufficient evidence to permit the jury to sustain the Currys' claim of promissory estoppel.

II

The Currys do not allege a promise to loan money on the basis of assurances by the bank that they were in compliance with the farm plan discussed the previous year, nor do they allege a promise solely on the basis of their ten-year finan-

cial relationship with the bank.[3] What the Currys do claim is that the bank made a clear manifestation that it would continue to extend credit to finance their farming operation for the upcoming spring planting season, and that the material terms for that loan can be determined from the nature of that transaction and through the course of dealings between the parties. The bank, as counter defendant, does not dispute the element of reliance. Rather, as appellant below, the bank argued only that there was no record support for a finding of a clear and definite promise as a matter of law.

The doctrine of promissory estoppel is set forth in 1 Restatement Contracts, 2d, § 90, p 242:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.[4]

Promissory estoppel developed to protect the ability of individuals to trust promises in circumstances where trust is essential. It is the value of

[3] Contrary to the Court of Appeals assertion, this case is not similar to *Ho v General Motors Corp*, 661 F Supp 618, 619 (ED Mich, 1987), aff'd 852 F2d 1287 (CA 6, 1988), where the plaintiff claimed GM promised to grant him the right to bid on future supply contracts. A subsidiary of GM assisted the plaintiff in the creation of his company and, for eleven years, GM awarded the plaintiff separate one-year contracts to supply the company's gloves. Neither assurances that the plaintiff was performing according to GM's standards nor the course of dealing between the parties constituted a definite promise the plaintiff would be allowed to bid on future contracts. Key to the court's holding was the fact that promissory estoppel cannot rest upon an alleged promise that the court cannot discern from the promisor's statements. The court found no promise, either express or implied, by GM to permit the plaintiff to bid on future contracts.

[4] Similarly, see 4 Williston, Contracts (4th ed), § 8:1 *et seq.*, pp 7-20; 1A Corbin, Contracts, § 193 *et seq.*, pp 187-192.

trust that forms the basis of the entitlement to rely. Farber & Matheson, *Beyond promissory estoppel: Contract law and the "Invisible Handshake,"* 52 U Chi L R 903, 928, 942 (1985).[5] However, the reliance interest protected by § 90 is *reasonable reliance,* and "reliance is reasonable only if it is induced by an actual promise." *School Dist No 69 of Maricopa Co v Altherr,* 10 Ariz App 333, 340; 458 P2d 537 (1969).

In Williston on Contracts, Professor Lord observes that although the elements required to invoke the doctrine are straightforward, they necessarily involve a threshold inquiry into the circumstances surrounding both the making of the promise and the promisee's reliance as a question of law. The existence and scope of the promise are questions of fact, and "a determination that the promise exists will not be overturned . . . unless it is clearly erroneous." 4 Williston, Contracts (4th ed), § 8:5, pp 84-85, 102-103.[6] Thus, while we agree

[5] For a cross section of the wide variety of situations in which the doctrine of promissory estoppel has been applied, see Barnett & Becker, *Beyond reliance: Promissory estoppel, contract formalities, and misrepresentations,* 15 Hofstra L R 443 (1987).

[6] In *R S Bennett & Co v Economy Mechanical Industries, Inc,* 606 F2d 182, 186 (CA 7, 1979), the court held:

> Although the matter of avoidance of injustice might seem to be a question of law, the satisfaction of the other elements is a question of fact, and summary judgment therefore should not be granted if the record shows a genuine issue as to the existence of these elements. [Citations omitted.]

See also *Maxwell v Bay City Bridge Co,* 41 Mich 453, 468; 2 NW 639 (1879), cited by the dissent, *post,* p 95. Although the issue of estoppel was not preserved for appeal and thus not properly before the Court, Justice COOLEY observed:

> [T]he question of [the doctrine of estoppel's] application in any case is a mixed question of law and fact, and in cases of jury trial must be submitted to the jury under proper instructions. Now however clear the facts in support of the estoppel may seem to be, it is always possible that there may be

with the Court of Appeals in the instant case that
the sine qua non of the theory of promissory
estoppel is that the promise be clear and definite,
we cannot agree with its narrow review of the
record as evidence that such a promise did not
exist.

The term promise is defined in 1 Restatement
Contracts, 2d, § 2, p 8:

> A promise is a manifestation of intention to act
> or refrain from acting in a specified way, so made
> as to justify a promisee in understanding that a
> commitment has been made.[7]

Courts are variably strict and flexible in determin-
ing whether a manifestation of intent may furnish
a basis for promissory estoppel. The strict view,
distinguishing promises that are future oriented
from statements of belief, holds that a statement
that is indefinite, equivocal, or not specifically
demonstrative of an intention respecting future

qualifying or overruling facts; and the conclusions from the
evidence must be drawn by the jury,—not by the court. [Cita-
tions omitted.]

[7] Comment a to § 90 cross references 1 Restatement Contracts, 2d,
§ 2. Comment a to § 2, p 9, provides further explanation:

"Promise" as used in the Restatement of this Subject denotes
the act of the promisor. If by virtue of other operative facts
there is a legal duty to perform, the promise is a contract; but
the word "promise" is not limited to acts having legal effect.
Like "contract," however, the word "promise" is commonly and
quite properly also used to refer to the complex of human
relations which results from the promisor's words or acts of
assurance, including the justified expectations of the promisee
and any moral or legal duty which arises to make good the
assurance by performance. The performance may be specified
either in terms describing the action of the promisor or in
terms of the result which that action or inaction is to bring
about.

See also 1 Williston, Contracts (4th ed), § 1:2, pp 8-13; 1 Corbin,
Contracts, § 13, pp 29-30.

conduct, cannot serve as the foundation for an actionable reliance. Feinman, *Promissory estoppel and judicial method,* 97 Harv L R 678, 690-692 (1984). This is usually determined by finding that the promisor's expression concerning his future conduct is insufficiently certain or defined. *McMath v Ford Motor Co,* 77 Mich App 721, 725; 259 NW2d 140 (1977).. "Similarly, if the expression is made in the course of preliminary negotiations when material terms of the agreement are lacking, the degree of certainty necessary in a promise is absent." Feinman, *supra* at 691-692.

Drawing heavily from the Restatement's definition of promise, it has been suggested that "[a] promise may be stated in words, either orally or in writing, or may be inferred wholly or partly from conduct. . . . Both language and conduct are to be understood in the light of the circumstances, including course of performance, course of dealing, or usage of trade." Farber & Matheson, *supra* at 932 and n 104. In addition, "[a] promise must [also] be distinguished from a statement of opinion or a mere prediction of future events." *Id.* at 933.[8] Variables such as the nature of the relationship between the parties, the clarity of the representation, as well as the circumstances surrounding the making of the representation, are important to the determination of whether the manifestation rises to the level of a promise. Both traditional contract and promissory estoppel theories of obligation use an objective standard to ascertain whether a voluntary commitment has been made.[9] To determine the existence and scope of a promise, we look to the words and actions of the transaction as well as the nature of the relationship between the parties and the circumstances surrounding their actions.

---

[8] See also Feinman, *supra* at 691-692.

[9] Farber & Matheson, *supra* at 915, 933.

Lenders and borrowers frequently enter into preliminary discussions of whether a loan will be refinanced or further credit will be extended. Bahls, *Termination of credit for the farm or ranch: Theories of lender liability,* 48 Mont L R 213, 219 (1987). And a lender should expect and "anticipate that a promise to lend needed money would induce a borrower to rely on the promise by making preparations for the loan . . . or to cease searching to borrow the money elsewhere." *First Nat'l Bank of Logansport v Logan Mfg Co, Inc,* 577 NE2d 949, 955 (Ind, 1991); *Malaker Corp Stockholders Protective Committee v First Jersey Nat'l Bank,* 163 NJ Super 463, 474; 395 A2d 222 (1978). However, general discussions of extending credit or "past renewals of credit should not lead a borrower to reasonably believe that credit will be extended or renewed again and again." Bahls, *supra* at 224. Expressions of contingency, *Cincinnati Fluid Power, Inc v Rexnord, Inc,* 797 F2d 1386 (CA 6, 1986), or of desire, *School Dist No 69 of Maricopa Co, supra,* or reassurances regarding past performance, *Ho v General Motors Corp,* 661 F Supp 618 (ED Mich, 1987), aff'd 852 F2d 1287 (CA 6, 1988), do not meet the promissory ideal. Nor does a course of past dealing where there has been a pattern of renewal in itself amount to sufficient assent to continue dealing or that renewal will be indefinite. Bahls, *supra* at 220.[10]

[10] See also *First Bank of WaKeeney v Moden,* 235 Kan 260, 264; 681 P2d 11 (1984), where the Kansas Supreme Court denied a farmer's claim that the bank was estopped from foreclosure because he had complied with the agreed-upon farm plan under the previous loan agreement, and the bank had always extended credit in the past and was thus obligated to do so in the future.

Similarly, in *Landess v Borden, Inc,* 667 F2d 628 (CA 7, 1981), the court denied a milk hauler's promissory estoppel claim against a dairy operator that a promise to continue to use the milk hauler in perpetuity could be implied from their three and one-half year course of dealing.

Although promissory estoppel has been used to enforce promises too indefinite or incomplete to constitute valid offers, *Hoffman v Red Owl Stores, Inc,* 26 Wis 683; 133 NW2d 267 (1965), it has been noted that considerable authority supports the proposition that maximizing the policy of contractual freedom "requires that the tests for the validity of the coincident promissory estoppel promise and contract offer be the same." Metzger & Phillips, *The emergence of promissory estoppel as an independent theory of recovery,* 35 Rutgers L R 472, 495 (1983). Thus, we observe that a promise " 'to continue to refinance or roll over [an existing] debt appears similar to an oral contract to [loan] money in the future,' " *Jamestowne on Signal, Inc v First Federal Savings & Loan Ass'n,* 807 SW2d 559, 565 (Tenn App, 1990); *Champaign Nat'l Bank v Landers Seed Co, Inc,* 165 Ill App 3d 1090; 519 NE2d 957 (1988), cert den 489 US 1019 (1989),[11] and that other jurisdictions have held that an oral promise to loan money in the future is not void for indefiniteness where the essential terms are determinable.[12] For a promise to loan money in the future to be sufficiently clear and definite, some evidence must exist of the material terms of the loan, including the amount of the loan, the interest rate, and the method of repayment.[13]

[11] Some jurisdictions have held promissory estoppel inapplicable in situations where mutual agreement has been reached upon all essential terms and that, regardless of either parties' reliance, the true action lies in breach of an oral contract. See, for example, *Gilmore v Ute City Mortgage Co,* 660 F Supp 437 (D Colo, 1986).

[12] *First Nat'l Bank of Logansport, supra* at 952-953. See also *Union State Bank v Woell,* 434 NW2d 712 (ND, 1989); *Dennis Chapman Toyota, Inc v Belle State Bank,* 759 SW2d 330 (Mo App, 1988); *Lohse v Atlantic Richfield Co,* 389 NW2d 352 (ND, 1986); *McErlean v Union Nat'l Bank of Chicago,* 90 Ill App 3d 1141; 414 NE2d 128 (1980); *Malaker Corp, supra; Hansen v Snell,* 11 Utah 2d 64; 354 P2d 1070 (1960); *Richards v Oliver,* 162 Cal App 2d 548; 328 P2d 544 (1958).

[13] Bahls, *supra* at 219. See *Jamestowne on Signal, supra* at 565, for a list of jurisdictions holding that essential terms of an oral contract

This approach is consistent with the general rule of contract that, where the parties have left open some matters to be determined in the future, enforcement is not precluded if there exists a method of determining the terms of the contract either by examining the agreement itself or by other usage or custom[14] that is independent of a party's mere "wish, will and desire." An enforceable agreement may be found "even though the determination is left to one of the contracting parties [as long as] he is required to make it 'in good faith' in accordance with [an] existing standard or with facts capable of objective proof." 1 Corbin, Contracts, § 95, p 402. The scope of an oral

to continue to loan money in the future must include the amount and duration of the loan, the interest rate, and, where appropriate, the method of repayment and the collateral.

Other courts have found that the terms of the promised loan need only be proven with a reasonable degree of certainty. See, for example, *Wait v First Midwest Bank/Danville*, 142 Ill App 3d 703, 708-709; 491 NE2d 795 (1986), where the Illinois Court of Appeals found that a promise to loan money was sufficiently definite where the duration of the loan could be established on the basis of custom or the terms of prior loans between the parties, and when the parties agreed that the interest rate would be the current variable rate charged.

Conversely, a minority of jurisdictions have determined that ambiguous or missing terms of a promise that are not essential to the reliance damage calculation will not preclude recovery under a promissory estoppel claim because the promise was too indefinite. See *Wheeler v White*, 398 SW2d 93 (Tex, 1965); *First Nat'l Bank of Logansport, supra; Rosnick v Dinsmore*, 235 Neb 738; 457 NW2d 793 (1990); *Hoffman v Red Owl Stores, Inc, supra*. In *Hoffman*, the Wisconsin Supreme Court noted that § 90 does not require that the promise triggering reliance be so comprehensive in scope as to meet the requirements of an offer that would ripen into a contract if accepted by the promisee. The Court further observed that it would be a mistake to equate promissory estoppel to a breach of contract action. *Id.* at 699.

See also Metzger & Phillips, *Promissory estoppel and reliance on illusory promises*, 44 SW L J 841 (1990), where the authors criticize the judiciary for extending promissory estoppel protection in the name of justice to promisees who relied on illusory promises.

[14] Because a "promise" of job security arises in the context of a presumption of employment at will, we have held that orally grounded obligations must be clear and unequivocal. *Rowe v Montgomery Ward & Co, Inc*, 437 Mich 627, 645; 473 NW2d 268 (1991).

promise may also be identified by referring to the facts surrounding the loan where there exists a previous course of dealing between the parties, thereby supplying some objective method by which the missing terms could be supplied. Farber & Matheson, *supra* at 915 and n 45. See also *Nat'l Farmers Organization, Inc v Kinsley Bank,* 731 F2d 1464, 1470 (CA 10, 1984).

The evidence, viewed in a light most favorable to the Currys, showed that the Currys were not in default on their outstanding loan when they visited the bank in January and February 1986 to discuss the dairy buy-out program and the $20,000 loan for the upcoming spring planting season. As noted above, during the conversation, Mr. Curry inquired whether his dairy operation would continue to be supported by the bank as it had been in the past. While the bank asserts that its "assurances" were not made in the context of a specific discussion regarding whether a loan in a particular amount would be made, there was no real denial of Mr. Curry's testimony that he went to the bank for the express purpose of learning whether he would receive financing should he decide to continue in the dairy business. The bank's officers stated that the bank would continue to support the Currys, although they did not guarantee such support for the following year. Objectively viewed, the jury was entitled to find that these were not merely words of assurance or statements of belief, but of a promise of future action, *Esquire Radio & Electronics, Inc v Montgomery Ward & Co, Inc,* 804 F2d 787 (CA 2, 1986).[15] Com-

[15] Although the dissent correctly recognizes the standard of review in this case, that evidence must be viewed in a light most favorable to the Currys, it fails to do so. Instead, the dissent's conclusion that a promise did not exist here is premised on a review of the bank officer's testimony regarding the deteriorating financial status of the Currys to support his ultimate decision to refuse to make the loan.

pare *Cincinnati Fluid Power, supra.* Believing they had a promise for the spring loan, the Currys did not submit a serious bid in the government's dairy buy-out program.[16] Instead, they waited for the bank's call to come in and sign the paperwork for the spring loan, which would include the upcoming spring operating funds and a rollover of the outstanding balance on the previous year's loan at the usual terms of two points over the bank's prime, amortized over five years, and paid directly out of the monthly proceeds from their milk contract with the MMPA.[17]

The question presented is not whether the bank would have been justified in denying the loan or the wisdom of the bank's decision in making it, but, rather, whether there was sufficient evidence to support a jury finding that the bank promised the Currys it would make the loan. We note, however, that the poor financial status of the Currys' dairy operation simply underscores their claim that they needed to know whether the bank would continue to support the farm if the Currys gave up the opportunity to submit a competitive bid in the buy-out program and get out of the dairy business.

Contrary to the dissent's assertions, we do not adopt a rule finding that "once a commercial lending relationship exists, debtors are entitled to rely upon vague affirmations of support to paralyze lenders' abilities to adjust to ever-changing market conditions." *Post,* p 98, n 5. The bank conceded reliance and does not raise the issues of consideration or damages. We find only that there was sufficient evidence in the record that the bank promised the Currys a 1986 spring planting loan during their meeting to discuss the loan and the buy-out program.

[16] The Court of Appeals statement that the Currys did not attempt to obtain the necessary funds elsewhere is erroneous. Mr. Curry and a representative of Farm Credit Services testified that, after the bank refused to make the loan for the spring of 1986, Mr. Curry sought funds from Production Credit Association, a lending arm of Farm Credit. However, because the State Bank of Standish and the Federal Land Bank held security agreements on all of the Currys' personal and real property, there was no collateral to secure a loan with a new lender.

[17] The bank asserted that the course of dealings between the parties had changed because the previous year's loan, for the first time, had been guaranteed by the Farmers Home Guarantee Program. However, there was ample evidence to support a finding by the jury that there had been no change in the customary loan procedure between the parties. In 1985, the bank was still the actual lender of funds, the terms of the loan were unchanged, and, finally, it was the bank's loan officer who completed all the necessary paperwork for both the loan

Thus, the trial court did not err in leaving the question of the existence of a clear and definite promise to the jury where it could have found from the evidence that the bank had promised to make the loan, the terms of which could be objectively determined from the nature of the transaction, and the ten-year history of the customary loan practices between the parties.[18] Accordingly, we reverse in part and affirm in part the decision of the Court of Appeals. We reinstate the jury's verdict in favor of the Currys and remand the case to the trial court for further proceedings consistent with this opinion.

CAVANAGH, C.J., and LEVIN, BRICKLEY, and MALLETT, JJ., concurred with BOYLE, J.

RILEY, J. (*dissenting*).

I

Because the statements at issue were not clear and definite promises necessary for the application of promissory estoppel, I respectfully dissent.

II

The majority omits significant facts underlying this litigation, therefore I recite the pertinent facts. Robert and Kathleen Curry were dairy and cash crop farmers who financed their operations

and the guarantee program. Mr. Curry testified that there was "[n]othing out of the ordinary" regarding the 1985 loan as compared to previous years, nor did he recall any discussion with bank officers informing him that future annual operating loans would have to be paid back on a yearly basis. Similarly, the bank's claim that there were errors in the farm report used for the 1986 loan was rebutted by the fact that these were chronic entry errors that the bank historically had been aware of and, as in prior years, had clarified and corrected them orally.

18 *Nat'l Farmers Organization, supra* at 1471.

through a series of one-year loans with the State Bank of Standish. Beginning in 1975, the bank usually approved loans at two percent over the prime lending rate, and the balance of the previous years' loans were rolled over. *Ante,* p 79. This method of financing, however, slowly began to accumulate debt, and, by 1983, the Currys' outstanding balance totaled at least $110,000. The next year the debt reached $151,000, and in 1985, it rose to $167,000. Noting the mounting debt, in 1985 the parties agreed to abandon the rollover basis of payment, and agreed that operating loans were to be paid on a yearly basis. The Currys secured the loans with nearly all of their realty and personal property. *Ante,* p 79.

In 1986, the Currys seriously considered submitting a bid to a federal program designed to reduce dairy surpluses by purchasing dairy farms.[1] *Ante,* p 79. The Currys discussed the program with Mr. Robert Garry, a vice president of the bank as well as the loan officer in charge of the Currys' file, and Mr. Matthew Pelts, an executive vice president. *Ante,* p 80. Mr. Curry testified that he "went down [to the bank] with the sole purpose and was very blunt about it, are you with me or against me. I wanted to know, should I continue farming, or should I get out, and, basically the bottom line was, you've done a good job, you've made your payments, we're with you." Mr. Curry repeatedly testified that the bank officers had pledged their "support" to the Currys.

In early 1986, Mr. Curry requested an annual loan of $20,000, which was later supplemented

---

[1] Farmers submitted selling bids to the government. If accepted, the government purchased the dairy herd and the farmer agreed not to reënter the dairy business for five years. If the Currys had submitted such a bid and it had been accepted, the Currys most likely would have received sufficient compensation to pay their debts and produce a profit.

with an additional request for $5,000 to tile a field. *Ante,* p 81. As part of the loan application process, the Currys submitted a "Tel Farm" statement, a recordkeeping system which generates income and expense records for businesses such as dairy farms. The bank discerned errors in the statement, including obvious omissions detailing the outstanding debt owed to the bank, and informed the Currys that they should correct the form. The bank's request went unheeded. However, at the bank's request, the Currys did provide their prior year's tax return, which recorded losses of $72,000.

The Currys, assuming their loan request would be approved, purchased seed and supplies, but delayed planting corn while awaiting funds from the bank. *Ante,* p 81. The bank's financial projections regarding the farm and its mounting debt, combined with the Currys' previous year's losses of $72,000, however, ultimately led the bank to deny the loan request.

In October 1986, the bank filed suit when the Currys failed to pay their obligations on the outstanding debt. The Currys counterclaimed, alleging, inter alia, that the bank's refusal to approve the 1986 operating loan was a breach of the duties of good-faith performance and fair dealing that resulted in substantial damages. The trial court ruled that although the Currys did not have a defense regarding their outstanding debt, they had alleged detrimental reliance warranting a trial.

On May 4, 1988, a six-day trial concluded with a jury verdict in favor of the Currys for $127,575. The trial court found that with interest and costs the Currys were entitled to $157,000 along with a setoff of $101,000 of outstanding debt to the bank, and awarded the Currys $56,000. The court denied the bank's motion for judgment notwithstanding the verdict or, in the alternative, remitter. In May

1991, the Court of Appeals reversed the denial of judgment notwithstanding the verdict. The Court held "there was no clear and definite promise of a loan sufficient to warrant [the Currys] subsequent purchases and actions and, consequently, insufficient evidence to establish their theory of promissory estoppel." 190 Mich App 616, 621; 476 NW2d 635 (1991).

This Court granted leave to appeal.

### III

The Court of Appeals reversed the trial court's denial of judgment notwithstanding the verdict because it found that there was insufficient evidence provided by the Currys to establish that the bank had made the clear and definite promise necessary for a successful assertion of promissory estoppel. In reviewing the decision of the Court of Appeals, this Court is to view the evidence in the light most favorable to the nonmoving party. *VanderWall v Midkiff*, 166 Mich App 668, 676; 421 NW2d 263 (1988). Hence, the Currys' testimony must be assumed true, and all reasonable inferences must be drawn.

### IV

### A

Justice COOLEY long ago explained the premise of promissory estoppel:

> The doctrine of estoppel rests upon a party having directly or indirectly made assertions, promises or assurances upon which another has acted under such circumstances that he would be seriously prejudiced if the assertions were suffered to be disproved or the promises or assurances to be withdrawn. [*Maxwell v Bay City Bridge Co,* 41 Mich 453, 467; 2 NW 639 (1879).]

See also *Holt v Stofflet,* 338 Mich 115, 119; 61 NW2d 28 (1953).[2]

Because promissory estoppel is an exception to general contract principles in that it permits enforcement of a promise that may have no consideration, the general rule is:

> In order that a statement or representation may be relied upon as creating an estoppel, its language must be clear and plain, or it must be clear and reasonably certain in its intendment, since estoppels must be certain and are not to be taken or sustained on mere argument or doubtful inference. [28 Am Jur 2d, Estoppel and Waiver, § 45, p 654.]

Hence, "a promise must be definite and clear." *McMath v Ford Motor Co,* 77 Mich App 721, 726; 259 NW2d 140 (1977).[3]

The requirement that promises be clear and definite is especially appropriate in the context of complex commercial financing. Hence, the majority recognizes that the finding of "general discussions of extending credit or 'past renewals of credit should not lead a borrower to reasonably believe that credit will be extended or renewed again and again.'." *Ante,* p 87 (citation omitted). In fact, "a

----

[2] More recently the doctrine has been articulated by four elements:

(1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee, (3) which in fact produced reliance or forbearance of that nature, (4) in circumstances such that the promise must be enforced if injustice is to be avoided. [*McMath v Ford Motor Co,* 77 Mich App 721, 725; 259 NW2d 140 (1977).]

[3] See also *Hebrew Teachers Ass'n v Jewish Welfare Federation,* 62 Mich App 54, 61-62; 233 NW2d 184 (1975); *Malaker Corp Stockholders Protective Committee v First Jersey Nat'l Bank,* 163 NJ Super 463, 479; 395 A2d 222 (1978) (referring to a " 'clear and definite promise,' the *sine qua non* for applicability of this theory of recovery").

pattern of renewal in itself [does not] amount to sufficient assent to continue dealing or that renewal will be indefinite." *Ante,* p 87 (citation omitted). Accordingly, the majority finds that "[f]or a promise to loan money in the future to be sufficiently clear and definite, some evidence must exist of the material terms of the loan, including the amount of the loan, the interest rate, and the method of repayment." *Ante,* p 88. This must be so because to enforce ambiguous promises of future financing is both inequitable and permits the speculative awarding of damages.[4]

### B

In the instant case, the testimony reveals that the alleged promise was so ambiguous as to bar the application of promissory estoppel. In *Malaker Corp Stockholders Protective Committee v First Jersey Nat'l Bank,* 163 NJ Super 463, 480; 395

---

[4] The essential justification for the doctrine of promissory estoppel is the avoidance of substantial hardship or injustice were the promise not to be enforced. Too liberal an application of the concept will result in an unwitting and unintended undermining of the traditional rule requiring consideration for a contract. This is particularly true where the promise is the loan of money. Such promises, even when unsupported by consideration, do induce borrowers to neglect to secure the needed money elsewhere, and lenders must be held to anticipate such conduct. To hold as enforceable, however, a voluntary promise of a loan made to one who, in reliance thereon, fails to exercise a valueless right to seek the money elsewhere, would be tantamount to rendering all such voluntary promises of a loan enforceable without consideration. A determination declaring such a deviation from presently accepted contract principles should only come from a confrontation with that issue, and not as an unintended consequence of the loose application of promissory estoppel to promises to lend money. [*Malaker Corp,* n 3 *supra* at 484.]

See also *Hebrew Teachers Ass'n,* n 3 *supra* at 61-62 ("Due to the indefiniteness and uncertainty of defendant's actual obligation, it is unclear what defendant promised plaintiff. . . . [Therefore] any award by the Court would be entirely speculative").

A2d 222 (1978), the court ruled that a promise to loan an unspecified amount of money was not sufficient to constitute a clear and definite promise for the purposes of promissory estoppel:

> At best, one could imply a promise of a loan of some indefinite amount guaranteed by additional collateral. We do not regard this kind of implied undertaking to lend an unspecified amount of money as the "clear and definite promise" that is required as an adequate foundation for estopping the bank to deny absence of consideration as a defense.

Similarly, the circumstances in the instant case do not constitute promissory estoppel. The vaporous and amorphous pledges of "support" were certainly not clear and definite promises. No terms of the loans were specified—the amount of the loan, the interest rates, the payment schedule, the method of payment were all undetermined. Nor were these statements of support formal agreements with merely some terms to be decided. The recent alteration of the terms of payment from a rollover to an annual payment basis, for instance, disproves any notion of "customary loan practices between the parties."[5] *Ante,* p 92. Moreover, the quickly souring financial circumstances of the Currys significantly altered any established customary

---

[5] In fact, following the analysis of the majority to its logical conclusion, if a vague pledge of support occurred before 1985 and the Currys had relied upon the ability to roll over their debt, the bank would have been estopped from altering the payment schedule. Similarly, if instead of denying the loan request the bank had approved a loan with an increased interest rate, the majority would also declare such an offer estopped. In essence, the majority finds that once a commercial lending relationship exists, debtors are entitled to rely upon vague affirmations of support to paralyze lenders' abilities to adjust to ever-changing market conditions. Such a holding does extreme violence to the doctrine of promissory estoppel, as well as freedom of contract.

norms between the parties.[6] Clearly the terms and approval of the annual loans were not fixed, but subject to annual renegotiation.[7] Furthermore, the majority relies heavily on the fact that Curry "went to the bank for the express purpose of learning whether he would receive financing should he decide to continue in the dairy business," *ante,* p 90, yet his intent is irrelevant to whether the bank made such a binding promise. Even after drawing all due inferences in favor of the Currys, the bank's statements were not a clear and definite promise sufficient to apply promissory estoppel because the bank clearly did not state the "material terms of the loan, including the amount of the loan, the interest rate, and the method of repayment." *Ante,* p 88. In the arena of highly complex financial lending, the bank's statements are too vague and ambiguous to possess the necessary definiteness to justify a legitimate use of promissory estoppel.

V

Because the statements at issue were not clear

[6] Contrary to the assertion of the majority, this opinion does not rest upon "a review of the bank officer's testimony regarding the deteriorating financial status of the Currys to support his ultimate decision to refuse to make the loan." *Ante,* p 90, n 15. In fact, I agree with the majority that the issue is "whether there was sufficient evidence to support a jury finding that the bank promised the Currys it would make the loan." *Id.* Unlike the majority, I have examined those statements which plaintiffs suggest constitute a clear and definite promise and find them wanting. I simply note the Currys' deteriorating financial conditions to belie the notion that an established pattern of lending existed or could be expected to continue under the circumstances. Hence, the vague affirmation of support should not be understood to be so sufficiently clear and definite that it incorporated "the material terms of the loan, including the amount of the loan, the interest rate, and the method of repayment." *Ante,* p 88.

[7] After all, the Currys did submit loan requests each year, and the bank did evaluate each request independently.

and definite promises necessary for the application of promissory estoppel, I respectfully dissent.

GRIFFIN, J., concurred with RILEY, J.