# STATE OF MICHIGAN

# COURT OF APPEALS

---

CONTROL ROOM TECHNOLOGIES, LLC, and
LANSING FIBER COMMUNICATIONS, LLC,

        Plaintiffs/Counter defendants-
        Appellees,

v

WAYPOINT FIBER NETWORKS, LLC,
WAYPOINT TELECOMMUNICATIONS, LLC,
R. CHARLES MCLRAVY, G. WOODWARD
STOVER, and PETER EMPIE

        Defendants,

and

KEPS TECHNOLOGIES, INC., d/b/a ACD.NET,

        Defendant/Counter plaintiff-
        Appellant.

UNPUBLISHED
April 28, 2015

No. 320553
Ingham Circuit Court
LC No. 10-000274-CK

---

Before: O'CONNELL, P.J., and FORT HOOD and GADOLA, JJ.

PER CURIAM.

Defendant/Counter plaintiff KEPS Technologies, Inc., doing business as ACD.Net (ACD), appeals as of right from an order granting summary disposition in favor of plaintiffs/counter defendants Control Room Technologies, LLC (Control Room) and Lansing Fiber Communications, LLC, under MCR 2.116(C)(7) (release) and (8) (failure to state a claim). We reverse and remand for further proceedings.

## I. FACTS

This case involves a dispute between several telecommunications providers over the use of a fiber optic cable network called the Lansing Fiber Ring (the Lansing Ring). On April 1,

2003, ACD and Waypoint[1] executed an Indefeasible Rights of Use Agreement (IRU Agreement), which granted ACD the right to use portions of the Lansing Ring. On August 22, 2008, Waypoint sold the Lansing Ring to Control Room by executing an asset purchase agreement.[2] A dispute soon arose over ACD's rights of use in the Lansing Ring. ACD claimed it was entitled to use the Lansing Ring under the IRU Agreement it entered with Waypoint before Waypoint sold the Lansing Ring to Control Room. Control Room argued that it was not bound by the IRU Agreement, was unaware such an agreement existed, and did not assume any contractual obligations to ACD when it purchased the Lansing Ring.

On March 10, 2010, Control Room filed a complaint seeking, among other things, a declaratory judgment that it owed no liability to ACD and that the IRU Agreement was inapplicable to Control Room's ownership of the Lansing Ring. After this, the parties agreed to participate in mediation. On April 8, 2010, mediation discussions resulted in a three-page handwritten purported settlement agreement.

The settlement agreement prefaced its terms by stating that the parties agreed "in principle to the following, subject to execution of a definitive agreement by the parties." The settlement agreement provided that ACD would be given twelve fibers on the central ring and eight fibers on all laterals, "with an additional 4 if they become available." It incorporated an "Extended IRU Agreement" from 2006 with certain modifications, and stated that ACD would have "open capsules available for splices" for "a period of time to be determined." The settlement agreement provided that Control Room would honor ACD's splice requests within 30 days at a price of $2050, but further "performance terms [were] to be determined." The settlement agreement stated that whether the Lansing Community College (LCC) west fiber lateral would be activated was to be determined, whether ACD would be permitted to provide services to LCC as an institution was to be determined, and the amount of time Control Room would have to furnish ACD with eight lateral fibers was to be determined. Lastly, the document stated that the instant lawsuit would be dismissed "upon execution of [a] definitive agreement."

The parties never executed the definitive agreement referenced in the settlement agreement. On August 30, 2010, ACD filed a counter complaint against Control Room, alleging breach of contract, tortious interference with a business relationship, and trade libel. Three years later, on December 26, 2013, Control Room filed a motion for summary disposition under MCR 2.116(C)(7) and (8), arguing that the purported settlement agreement was a valid and enforceable contract that resolved all material disputes between the parties and released Control

---

[1] Defendant Waypoint Fiber Networks, LLC (Waypoint) was the previous owner and operator of the Lansing Ring. Defendant Waypoint Telecommunications, LLC is an affiliate of Waypoint, and defendants R. Charles McLravy, G. Woodward Stover, and Peter Empie were either officers, directors, principals, or agents of Waypoint and its affiliates. These defendants are not involved in this appeal.

[2] Lansing Fiber Communications, LLC is an assignee of Control Room's rights and interests under the asset purchase agreement executed between Waypoint and Control Room. These parties are referred to collectively as "Control Room" throughout this opinion.

Room from all pending claims. Following a hearing, the trial court granted Control Room's motion for summary disposition and dismissed the case with prejudice.

## II. STANDARDS OF REVIEW

We review de novo a trial court's decision granting a motion for summary disposition. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). Summary disposition under MCR 2.116(C)(7) is proper if the undisputed facts establish that a claim is barred by release. *Hungerman v McCord Gasket Corp*, 189 Mich App 675, 677; 473 NW2d 720 (1991). In assessing a decision under MCR 2.116(C)(7), we "consider all documentary evidence submitted by the parties, accepting as true the contents of the complaint unless affidavits or other appropriate documents specifically contradict them." *Fane v Detroit Library Comm*, 465 Mich 68, 74; 631 NW2d 678 (2001). A motion under MCR 2.116(C)(8) tests the legal sufficiency of a complaint, and we consider all well-pleaded facts in a light most favorable to the non-moving party. *Maiden*, 461 Mich at 119. A motion under MCR 2.116(C)(8) is only appropriately granted if the alleged claims are "so clearly unenforceable as a matter of law that no factual development could possibly justify recovery." *Id.* (citation and quotation marks omitted).

An agreement between parties to settle a lawsuit is a contractual question governed by the principles of contract construction and interpretation. *Kloian v Domino's Pizza, LLC*, 273 Mich App 449, 452; 733 NW2d 766 (2006). Whether a legally binding and enforceable settlement agreement exists is a question of law reviewed de novo. *Id.*

## III. DISCUSSION

ACD argues that the lower court erred in concluding that the settlement agreement was a binding contract that released Control Room from all claims because the document lacked several material terms of the parties' agreement. We agree.

An enforceable contract does not exist under Michigan law unless there is mutual assent on all essential terms. *Eerdmans v Maki*, 226 Mich App 360, 364; 573 NW2d 329 (1997). In examining whether there was mutual assent between the contracting parties, the chief goal is to ascertain the parties' intent by examining the objective manifestations of that intent. *Heritage Broadcasting Co v Wilson Communications, Inc*, 170 Mich App 812, 818; 428 NW2d 784 (1988). "An agreement to settle a pending lawsuit is a contract, governed by the legal rules applicable to the construction and interpretation of other contracts." *Reicher v SET Enterprises, Inc*, 283 Mich App 657, 663; 770 NW2d 902 (2009). Likewise, under Michigan law, a contract to make a subsequent contract may be just as valid as any other contract. *Heritage Broadcasting Co*, 170 Mich App at 819. However, "[t]o be enforceable, a contract to enter into a future contract must specify all its material and essential terms and leave none to be agreed upon as the result of future negotiations." *Id.*

In determining whether a contract sufficiently covers all material terms of the parties' agreement, we consider whether the "promises and performances to be rendered by each party are set forth with reasonable certainty" and whether the "essentials are defined by the parties themselves." *Nichols v Seaks*, 296 Mich 154, 159; 295 NW 596 (1941). In some cases, the law may supply missing nonessential details of a contract by construction. See *Siegal v Sharrard*,

276 Mich 668, 673; 268 NW 775 (1936) ("Where no time for payment is stated [in a contract], the law will presume a reasonable time."). Yet, an enforceable contract does not exist if the parties have left open matters for future negotiation and there is no "method of determining the terms of the contract either by examining the agreement itself or by other usage or custom that is independent of a party's mere 'wish, will and desire.' " *State Bank of Standish v Curry*, 442 Mich 76, 89; 500 NW2d 104 (1993).

In this case, the settlement agreement left open material terms for future resolution. The settlement agreement provided that ACD could have one port reserved on each open capsule "for a period of time to be determined," and stated that Control Room would honor ACD's splice requests within 30 days at a price of $2050, but "[f]urther performance terms," such as the time and method of payment, were "to be determined." The settlement agreement left open whether "[Lansing Community College] West fiber lateral" would be activated, and whether ACD would be permitted to provide services to LCC as an institution. The settlement agreement also stated that the "[t]ime needed to rebuild ring/lateral to furnish ACD 8 fibers" was "to be determined."

Several of these open terms, including whether and how long Control Room would allow ACD to provide services to LCC, whether certain lateral fibers would be activated, and how long Control Room would allow ACD to reserve ports on each open capsule, could not be adequately defined through principles of contract interpretation and construction absent definition "by the parties themselves." *Seaks*, 296 Mich at 159. The dissent contends that the only terms left "to be determined" were periods of time for performance. However, the settlement agreement specifically left open whether ACD would be permitted to provide services to LCC as an institution, and whether the LCC west fiber lateral would be activated. These undefined terms do not merely implicate periods of time for performance. Rather, they are material terms of the settlement agreement, which could not be defined through general principles of reasonableness, trade usage, or custom. See *Curry*, 442 Mich at 89. Again, "[t]o be enforceable, a contract to enter a future contract must specify *all* its material and essential terms and leave *none* to be agreed upon as the result of future negotiations." *Heritage Broadcasting Co*, 170 Mich App at 819 (emphasis added). Accordingly, we conclude that the settlement agreement was not sufficiently definite to constitute an enforceable contract.

We also find persuasive the fact that this suit involved fairly complex issues, and the purported settlement agreement was only three handwritten pages in length.[3] In *Hill v McGregor Manufacturing Corp*, 23 Mich App 342, 345; 178 NW2d 553 (1970), this Court addressed a similar scenario to the case at hand, and held the following:

> From the pleadings it is evident that these were complicated lawsuits involving patents, manufacturing rights, use and ownership of hardware, and

---

[3] The dissent takes issue with characterizing the settlement agreement as a three-page document, instead arguing that the agreement was over 50 pages in length because the three-page document incorporated other agreements by reference. However, because material terms within the three-page settlement agreement were left undefined, all provisions within the document, including those attempting to incorporate other agreements, were rendered invalid and unenforceable.

contribution of the parties.  We find the one-page August 21, 1968 "Memorandum of Understanding" so cursory in its treatment of these matters as to convince us that the parties did not intend that document to be an enforceable agreement. Therefore, the lower court erred in entering it as the judgment of the court.

One month after ACD and Control Room drafted the three-page handwritten purported settlement agreement on April 8, 2010, Control Room executed another settlement agreement with Waypoint.  Tellingly, the settlement agreement executed between Control Room and Waypoint was 26 typed pages in length.  Although not dispositive, we also find persuasive that the parties explicitly identified the document as an agreement "in principle," the parties expressly conditioned dismissal of the suit "upon execution of [a] definitive agreement," and neither party attempted to enforce the settlement agreement for more than three years after its execution.  This objective evidence suggests that the parties did not intend to create an enforceable contract.[4]

## IV. CONCLUSION

Considering the essential terms that were omitted from the settlement agreement, and the circumstances surrounding its execution, we conclude that the three-page handwritten settlement agreement was so cursory in its treatment of the complex matters litigated below that the parties did not intend the document to constitute a binding contract.  Accordingly, the trial court erred in concluding that the settlement agreement constituted an enforceable contract that released the parties from all pending claims and warranted dismissal of the case.

Reversed and remanded for further proceedings.

/s/ Karen M. Fort Hood
/s/ Michael F. Gadola

---

[4] On appeal, the parties devote significant time debating whether the prefatory language, stating that the parties agreed "in principle to the following, subject to execution of a definitive agreement," constituted a condition precedent.  Because we conclude that the settlement agreement was not an enforceable contract regardless, we need not address this secondary issue.

-5-