**In re EXEMPLAR MANUFACTURING COMPANY, Exemplar/Thomas & Betts Electrical Systems, L.L.C., Debtor.**

**Exemplar Manufacturing Company, Exemplar/Thomas & Betts Electrical Systems, L.L.C., Plaintiffs,**

**v.**

**Lear Corporation, Defendant.**

Bankruptcy No. 03–41359.

Adversary No. 03–4972.

United States Bankruptcy Court,
E.D. Michigan,
Southern Division.

Oct. 14, 2005.

Joseph M. Fischer, Carson Fischer, PLC, Birmingham, MI, for Debtor.

## OPINION DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THOMAS J. TUCKER, Bankruptcy Judge.

This case involves the application of Michigan contract law on liquidated damages. The case is before the Court on cross-motions for summary judgment. Plaintiff Exemplar Manufacturing Company seeks summary judgment on its breach of contract claim (Count I in its adversary complaint). Defendant Lear Corporation seeks summary judgment on both counts of Plaintiffs' complaint. The Court held a hearing and took the motions under advisement. The Court has determined, based on the undisputed facts, that (1) the contractual provision Exemplar relies on for its breach of contract claim (Count I) is an unenforceable penalty under Michigan law, and (2) the necessary elements of a promissory estoppel claim (Count II) cannot be proven. The Court must therefore deny Exemplar's motion for summary judgment and grant Lear's motion for summary judgment.

### I. Undisputed Facts.

The material facts are not in dispute. The Plaintiffs are Debtors in a Chapter 11 case filed on January 16, 2003.[1] Pre-petition, Defendant Lear Corporation ("Lear"), a Tier 1 automotive supplier, contracted with Plaintiff Exemplar Manufacturing Company ("Exemplar"), for Exemplar to produce component parts for the GM 357 Program, under which Lear was a supplier to General Motors Corporation

---

1. The Court confirmed the Debtors' plan of liquidation on April 13, 2005.

("GM").[2] Exemplar, through its wholly-owned subsidiary Thomas & Betts Electrical Systems ("ET & B"), produced wire harnesses for the GM 357 Program at its facilities in Empalme, Mexico ("Empalme facilities").[3] Because the GM 357 Program was allegedly causing Exemplar to lose money and to experience "significant financial difficulties," on September 27, 2002, Exemplar entered into a "Resourcing Agreement" with Lear and Comerica Bank ("Comerica"), Exemplar's lender, under which the parties agreed that Lear would resource the GM 357 Program.[4] The Resourcing Agreement provided, in part, that "Lear will exercise its best efforts to complete the resourcing of the GM 357 Program on or before October 31, 2002 (but without liability if such resourcing is not completed on or before November 7, 2002)."[5] The agreement then stated:

If the resourcing of the GM 357 Program is not completed on or before November 7, 2002, then for each day after November 7, 2002 until the date the GM 357 Program resourcing is completed, Lear will pay Exemplar $16,667.00 (1/30 of $500,000), provided that the delay in Lear resourcing was not caused by Exemplar's failure to cooperate in the resourcing effort (to the extent Exemplar was reasonably able to provide such cooperation).[6]

The $500,000 figure was based on a representation Exemplar made to Lear that Exemplar was losing $500,000 per month in producing the wire harnesses for the GM 357 Program in Exemplar's Empalme facilities.

Also on September 27, 2002, Exemplar entered into an "Access and Security Agreement" with Lear, GM, Ford Motor Company ("Ford"), and other customers of Exemplar that issued purchase orders and/or supply contracts to Exemplar for component parts.[7] The Access and Security Agreement granted each customer of Exemplar a right of access to "all assets necessary or helpful for production of Component Parts, wherever located, including Equipment, Real Property, Contract Rights and General Intangibles[,]" in the event of a Default by Exemplar.[8] In the event of a default, a customer could invoke the right of access, and take over production at Exemplar's plants. Such a customer invoking the right of access could produce its own parts and instead of paying Exemplar the purchase order price for those parts, would instead pay:

the actual costs and expenses incurred in connection with the manufacturing and sequencing of the Component Parts and the occupancy of the Real Estate during the Access Period, including

---

**2.** (*See* Adversary Compl. at 2–3 ¶¶ 7, 12–14.) Exemplar alleges that Plaintiff Thomas & Betts Electrical Systems ("ET & B"), its wholly-owned subsidiary, also had a contractual relationship with Lear regarding the GM 357 Program. Lear *denies* any contractual relationship between Exemplar and ET & B. The Court need not decide this issue and declines to do so, because it is not material to its decision on the cross-motions for summary judgment.

**3.** (*See* May 28, 2004 Dep. Tr. of Gordon Schreur ("Schreur Dep. Tr.")(attached as Ex. C to Pls.' Br. in Opposition to Lear Corporation's Mot. For Summ. J.) at 68 Ins. 9–13.)

**4.** (*See* Ex. 8 to Lear's Mot. For Summ. J. ("Resourcing Agreement") at 1 Recitals ¶¶ A–B.)

**5.** (*Id.* at 1 ¶ I.A.)

**6.** *Id.*

**7.** (*See* Ex. 7 to Lear's Mot. For Summ. J. ("Access and Security Agreement") at 1 Recital A.)

**8.** (*Id.* at 3 ¶ 1 ("Defined Terms") ("Operating Assets").)

without limitation, utilities and other overhead expenses, prorated property taxes and assessments attributable to the Operating Assets and the Real Estate, and any payments due on account of any of the Operating Assets or the Real Estate which are leased from third parties[.] [9]

Any customer invoking the right of access was also required to produce parts for Exemplar's other customers during the access period, "provided that such customers have agreed to make payment to the exercising Customer(s), or their designee(s) for such customer's allocable share of overhead and related expenses and direct expenses related to such customer's production[.]" [10]

On October 15, 2002, Ford exercised its right of access under the Access and Security Agreement, and through its designee, Stout Risius Ross, Inc. ("SRR"), took control of, and operated Exemplar's Empalme facilities (Plants 4, 8, and 10). These facilities produced, among other component parts, the component parts for the GM 357 program. Ford operated these facilities under the Access and Security Agreement until December 26, 2002. From October 15, 2002 through December 26, 2002 (the "Access Period"), Ford produced component parts for itself and for certain of Exemplar's customers, paid the costs of operating the Empalme facilities and producing component parts for itself and for Exemplar's customers, and billed Exemplar's customers for their allocable share of these costs.[11] On October 16, 2002, Ford provided Exemplar's customers with a pre-

liminary cost-sharing budget for operating Exemplar's Empalme facilities.[12] In February 2002, Ford provided Exemplar's customers with the actual costs of operating Exemplar's Empalme facilities.[13] Because the actual costs were greater than the budgeted costs, Ford issued revised billings to Exemplar's customers.[14]

Lear did not complete its resourcing for the GM 357 Program away from the Exemplar facilities until November 23, 2002. As a result, Ford, through SRR, produced component parts for the GM 357 Program for Lear from October 15, 2002 through November 23, 2002. For this period, Ford billed Lear for its allocable share of the overhead and related costs of operating the Empalme facilities, and for the direct costs associated with the production of component parts for the GM 357 Program. Under the preliminary budget, Lear paid approximately $118,000 more to Ford/SRR for component parts produced at the Empalme facilities for the GM 357 Program than it would have paid under its purchase orders with Exemplar. Later, after the actual costs were determined, Lear still owed Ford $238,000, and paid that balance on April 22, 2003.[15]

After Plaintiffs Exemplar and ET & B filed voluntary petitions for relief under Chapter 11, they filed a two-count adversary complaint against Lear seeking $266,676, plus costs, interest, and attorney fees. Their claims are based on Lear's failure to resource the GM 357 Program by the November 7, 2002 date in the Re-

9. (*Id.* at 5 ¶ 3(b)(iv).)

10. (*Id.* at 6 ¶ 3(b)(vii).)

11. (*See* Aff. of Laura Marcero at 3 ¶ 12.) Laura Marcero is a Manager at SRR.

12. (*Id.* at 3 ¶ 9; Ex. 3 of Aff. of Laura Marcero.)

13. (Aff. of Laura Marcero at 4 ¶ 13; Ex. 5 of Aff. of Laura Marcero.)

14. (*See* Aff. of Laura Marcero at 4 ¶ 14; Ex. 7 of Aff. of Laura Macero.)

15. (*Id.* at 5 ¶ 14.)

sourcing Agreement. In Count I (Breach of Contract), Plaintiffs allege that Lear breached the Resourcing Agreement by failing to pay Exemplar $16,667 per day from November 8, 2002 through November 23, 2002, the date on which Lear completed its resourcing of the GM 357 Program (16 days × $16,667 = $266,676). In Count II, Plaintiffs seek recovery of the same amount under a theory of promissory estoppel. Exemplar filed a motion for summary judgment on Count I only, while Lear filed a motion for summary judgment on both counts.

## II. Jurisdiction.

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D.Mich.). The parties have consented to the bankruptcy court entering a final judgment in this matter under 28 U.S.C. § 157(c)(2), thus making it unnecessary to decide whether this is a "core" proceeding under 28 U.S.C. § 157(b)(2).[16]

## III. Discussion.

### A. Summary Judgment Standard.

Fed.R.Civ.P. 56(c), made applicable to bankruptcy adversary proceedings by Fed. R.Bankr.P. 7056, provides that a motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In *Cox v. Kentucky Department of Transportation,* 53 F.3d 146, 149–50 (6th Cir.1995), the court elaborated:

The moving party has the initial burden of proving that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. To meet this burden, the moving party may rely on any of the evidentiary sources listed in Rule 56(c) or may merely rely upon the failure of the nonmoving party to produce any evidence which would create a genuine dispute for the [trier of fact]. Essentially, a motion for summary judgment is a means by which to challenge the opposing party to 'put up or shut up' on a critical issue. If the moving party satisfies its burden, then the burden of going forward shifts to the nonmoving party to produce evidence that results in a conflict of material fact to be resolved by [the trier of fact]. In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party. However, if the evidence is insufficient to reasonably support a ... verdict in favor of the nonmoving party, the motion for summary judgment will be granted. Thus, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff.

. . .

Finally, the Sixth Circuit has concluded that, in the "new era" of summary judgments that has evolved from the teachings of the Supreme Court in *Anderson [v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)], *Celotex [Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)] and *Matsushita [Electric Indus-*

---

16. The parties gave this consent orally during the hearing on these summary judgment mo-tions.

trial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)], trial courts have been afforded considerably more discretion in evaluating the weight of the nonmoving party's evidence. The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts. If the record taken in its entirety could not convince a rational trier of fact to return a verdict in favor of the nonmoving party, the motion should be granted.

*Id.* (internal quotation marks and citations omitted). In determining whether the moving party has met its burden, a court must "believe the evidence of the nonmovant, and draw all justifiable inferences in favor of the nonmovant." *Ingram v. City of Columbus*, 185 F.3d 579, 586 (6th Cir. 1999) (relying on *Russo v. City of Cincinnati*, 953 F.2d 1036, 1041–42 (6th Cir. 1992)). Applying these standards to the cross-motions for summary judgment in this case, the Court concludes that there are no genuine issues of material fact, and that Lear's motion must be granted and Exemplar's motion must be denied.

## B. Count I of Plaintiffs' Adversary Complaint.

Count I of the Complaint is based on Paragraph I.A of the Resourcing Agreement. Paragraph I.A requires Lear to pay Exemplar $16,667 per day for every day after November 7, 2002 that Lear failed to complete the resourcing of the GM 357 Program. Lear argues that this is a liquidated damage clause that is unenforceable under Michigan law. Lear claims it is unenforceable because "(a) it is a penalty, (b) it violates the principle of just compensation, (c) it is unreasonable, and (d) Plaintiffs suffered no actual damages."[17] Lear argues that because Para-

graph I.A is unenforceable, Exemplar is only entitled to the actual damages, if any, that it incurred as a result Lear's delay in resourcing the GM 357 Program. And Exemplar's complaint alleges no such actual damages.

Consideration of Lear's arguments requires a review of Michigan law on liquidated damages. The Resourcing Agreement does not contain a choice of law provision, but the parties agree that it is governed by Michigan law. The parties note that the contract was entered into in Michigan and that Exemplar is a corporation headquartered in Michigan.

Under Michigan law, "[a] liquidated damages provision is simply an agreement by the parties [to a contract] fixing the amount of damages in case of a breach." *UAW–GM Human Res. Ctr. v. KSL Recreation Corp.*, 228 Mich.App. 486, 579 N.W.2d 411, 421 (1998) (citation omitted).

Lear argues that the Court should apply Article 2 of Michigan's Uniform Commercial Code in determining whether Paragraph I.A of the Resourcing Agreement is enforceable. This is so, Lear says, because the Resourcing Agreement was a modification of the contract for Exemplar to sell goods (component parts for the GM 357 Program), and because the subject matter of the Resourcing Agreement was the sale of goods. UCC Article 2 applies to "transactions in goods." Mich. Comp. Laws Ann. § 440.2102.

Exemplar argues that Michigan common law applies, rather than UCC Article 2, because the essence of the Resourcing Agreement was that Exemplar wanted the GM 357 Program out of its facilities. Therefore, the fundamental basis of the contract did not concern the sale of goods

---

**17.** (Lear's Mot. For Summ. J. at 3 ¶ 6.)

per se, but rather, it concerned the economic impact of the parties' relationship.

It is not necessary to resolve this dispute, because the Court concludes that the basic principles, and the result in this case, are the same under either UCC Article 2 or Michigan common law.

Under UCC Article 2, liquidated damages are enforceable if they are "reasonable" when viewed in light of several factors; an "unreasonably large" liquidated damages amount is "void as a penalty." Mich. Comp. Laws Ann. § 440.2718(1)[UCC § 2–718], provides in relevant part that:

> Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.

█ Michigan common law is essentially the same. A liquidated damage clause is void as a penalty if it provides for an amount of damages that is unreasonable in light of the possible injury suffered in the event of a breach. *See, e.g., Curran v. Williams,* 352 Mich. 278, 89 N.W.2d 602, 604 (1958)("Courts will not permit parties to stipulate unreasonable sums as damages, and where such an attempt is made have held them penalties and therefore void and unenforceable."); *Hertzberg v. Nunn Bush Shoe Co. (In re Constr. Diversification, Inc.),* 36 B.R. 434, 436 (E.D.Mich.1983)("Liquidated damages provisions are valid and enforceable elements of construction contracts under the law of Michigan if the amount of such damages is a reasonable estimate of the actual damages and the latter cannot be predicted with accuracy at the time of formation.")

█ "[R]easonableness is a function, at least in part, of the accuracy with which such stipulated damages approximate the *actual damages* incurred by the party seeking enforcement of the liquidated damages provision." *Hertzberg,* 36 B.R. at 436 (emphasis in original); *see also Centr. Trust Co. v. Wolf,* 255 Mich. 8, 237 N.W. 29, 31 (1931). Under Michigan common law, the overriding principle is one of just compensation—*i.e.,* that a contracting party should be justly compensated for the actual damages it sustains in the event of a breach. In *Curran,* the Michigan Supreme Court explained:

> The purpose in permitting a stipulation of damages as compensation is to render certain and definite that which appears to be uncertain and not easily proven. The courts recognize that the parties, particularly at the time of execution of the instrument, are in as good a position as anyone to arrive at a fair amount of damages for a subsequent breach. In the event they are not unconscionable or excessive courts will not disturb it. Just compensation for the injuries sustained is the principle at which the law attempts to arrive.

*Curran v. Williams,* 89 N.W.2d at 604. At least where damages are difficult to calculate, the court may consider whether in setting the amount of liquidated damages, the parties made an honest attempt to estimate the just compensation for the actual damages likely to occur in the event of a breach. In *Nichols v. Seaks,* 296 Mich. 154, 295 N.W. 596, 599 (1941), the Michigan Supreme Court noted:

> Where damages are difficult of ascertainment, courts will respect the honest attempt of the parties themselves to compute as best they can the just compensation from loss of the bargain by breach. Before accepting as conclusive

the convention of the parties, it must be examined, and the court must determine whether the predetermined figure is really in the nature of an attempted computation of the actual damages likely to result, or whether it has the effect of exacting a penalty from the contract breaker.

*Id.* (citations omitted); *see also Hall v. Gargaro,* 310 Mich. 693, 17 N.W.2d 795, 796–97 (1945)(same, quoting *Nichols*).

Exemplar admits that if Paragraph I.A. of the Resourcing Agreement is a liquidated damage clause, the "penalty" analysis applies. Exemplar argues that under that analysis, Paragraph I.A is enforceable because the amount of the payments it requires is reasonable.

■ But as a threshold issue, Exemplar argues that Paragraph I.A is not a liquidated damage clause at all, and that the penalty analysis does not apply—*i.e.,* that the provision is enforceable and not subject to judicial scrutiny about its "reasonableness." Rather than being a liquidated damages clause, Exemplar argues, it is an enforceable "incentive" provision.[18]

Exemplar argues that Paragraph I.A of the Resourcing Agreement cannot be considered a liquidated damage provision, because it is not an agreed remedy for an underlying breach of the contract. Exemplar argues that a failure by Lear to resource the GM 357 Program by November 7, 2002 was not a breach of the Resourcing Agreement as long as Lear was using its best efforts to resource the GM 357 Program, and thus, the $16,667 per day rate charged was not intended to be liquidated damages for a breach of the Resourcing Agreement. Rather, this per day rate was, in effect, an agreed upon charge for Lear's remaining on the premises after November 7, 2002.

Put another way, Lear's argument is that Exemplar's $16,667 per day claim under Paragraph I.A. is not for damages for any breach of contract, but rather, is only a claim for breach of Paragraph I.A. itself. Exemplar also points to the fact that the parties did not label Paragraph I.A as a liquidated damage clause in the Resourcing Agreement.

Exemplar relies on *CP Ltd. P'ship v. Chestnut Creek Farm, Inc.,* No. 246049, 2004 WL 1088403, 2004 Mich.App. LEXIS 1215 (Mich.Ct.App. May 13, 2004), and argues that Michigan case law distinguishes between an unenforceable liquidated damage provision and an enforceable incentive provision. Exemplar argues that Paragraph I.A was merely an enforceable "incentive" for Lear to resource no later than November 7, 2002. Exemplar relies on the deposition testimony of Edward Mahon ("Mahon"), Lear's deputy general counsel, who was involved in the negotiation of the Resourcing Agreement and who signed it on behalf of Lear. Mahon testified that negotiations regarding Paragraph I.A were aimed at creating an incentive for Lear to resource the GM 357 Program as quickly as possible: "The negotiation [regarding Paragraph I.A] revolved around the representation [by Joseph Fischer, Exemplar's counsel, who was involved in the negotiations of the Resourcing Agreement,] that production of the 357 harness was costing Exemplar 500,000 bucks a month. So that's how the $500,000 came up, and the 1/30th was just a way to incentivize Lear to get out as soon as possible[.]"[19]

---

18. (Pls.' Br. in Opposition to Lear Corporation's Mot. For Summ. J. at 4–7 ¶ I.A; Exemplar Manufacturing Company's Reply to

Lear's Resp. Opposing Exemplar's Mot. For Summ. J. at 2–5 ¶¶ B–C.)

19. (May 21, 2004 Dep. Tr. of Edward Mahon ("Mahon Dep. Tr.")(attached to Pls.' Br. in

The Court agrees with Lear that, although not labeled as such, Paragraph I.A of the Resourcing Agreement is, at a minimum, the functional equivalent of a liquidated damage clause under Michigan law, and that it is to be treated as such. The Court rejects Exemplar's effort to distinguish this provision as an "incentive" provision. First, the *CP Ltd. P'ship* case relied on by Exemplar is an unpublished opinion. Under Michigan Court Rule 7.215(C)(1), "[a]n unpublished opinion is not precedentially binding under the rule of stare decisis."

Second, *CP Ltd. P'ship* is not on point. That case concerned the interpretation of a provision in a purchase agreement and a related escrow agreement. The agreements required the buyer of a mobile home park to place $100,000 in an escrow account for the seller to use to complete a road improvement project. *CP Ltd. P'ship,* 2004 WL 1088403, at *3, 2004 Mich. App. Lexis 1215, at *3. The purchase agreement provided, in relevant part: "If the Project is not completed on or before eighteen (18) months from the Closing Date, the Escrow Agreement shall be terminated and all remaining funds delivered to Buyer." *Id.* at *5, 2004 Mich.App. Lexis 1215, at *9. The road project was not completed or even begun within 18 months. *Id.* The seller argued, in part, that the provision in the purchase agreement requiring the return of the funds in the escrow account to the buyer was an "illegal penalty clause." *Id.* at *5, 2004 Mich.App. Lexis 1215, at *16. The court disagreed, finding the provision at issue to be "an incentive provision" rather than a liquidated damage clause. *Id.*

The provision at issue in *CP Ltd. P'ship* is materially different from Paragraph I.A of the Resourcing Agreement. The provision in *CP Ltd. P'ship* provided the seller with a positive reward, namely, $100,000 to use in a road development project if it acted by a certain date. If it delayed acting, the escrow agreement terminated, and the parties were, in effect, returned to their pre-contracting position regarding the $100,000 to be used for the project. Under the Resourcing Agreement, Paragraph I.A provides, at best, a negative incentive if Lear delayed in performing, but the Resourcing Agreement remained in full force and effect. The *CP Ltd. P'ship* case is therefore not instructive for this case, even if Michigan law did consider it as binding precedent.

Third, Exemplar's "incentive" argument proves too much. Every liquidated damages clause can be said to be an "incentive" not to breach the contract, yet Michigan law subjects such provisions to scrutiny under a penalty analysis.

Fourth, the Court rejects Exemplar's conceptual argument, that Paragraph I.A of the Resourcing Agreement does not provide damages for breach of some other provision of the agreement, and is therefore not subject to a penalty analysis.

Conceptually, the provision at issue could have been structured in at least two different ways. The first of these is the structure chosen by the parties: Lear must pay $X per day after Y date that Lear does not complete the resourcing. The second way is: (a) Lear must resource by Y date; and (b) if Lear breaches that duty by failing to resource by Y date, it must pay liquidated damages of $X per day. The second structure is clearly a liquidated damages clause under Michigan law, subject to the penalty analysis. But there is no functional or practical difference between that structure and the first structure. There is no good reason to

Opposition to Lear Corporation's Mot. For Summ. J. at Ex. B) at 28 Ins. 12–16.)

subject the second type of clause to the penalty analysis, as Michigan law clearly does, while not doing so as to the first type of clause. As to each clause, if it violates Michigan's overriding principle of "just compensation," because its amount is unreasonably high, it is unenforceable. As noted earlier, "[j]ust compensation for the injuries sustained is the principle at which the law attempts to arrive." *Curran*, 89 N.W.2d at 604.

The Restatement of the Law of Contracts supports this conclusion. It contains a provision on liquidated damages (§ 356), that is much like the UCC provision that Michigan has adopted. One of the comments to that section notes:

> Sometimes parties attempt to disguise a provision for a penalty by using language that purports to make payment of the amount an alternative performance under the contract, that purports to offer a discount for prompt performance, or that purports to place a valuation on property to be delivered. Although the parties may in good faith contract for alternative performances and fix discounts or valuations, *a court will look to the substance of the agreement* to determine whether this is the case or whether the parties have attempted to disguise a provision for a penalty that is unenforceable under this Section.

Restatement (Second) of Contracts: Liquidated Damages and Penalties § 356 cmt. c (1981)(emphasis added). The Restatement provides an illustration of this point:

> A contracts to build a house for B for $50,000 by a specified date or in the alternative to pay B $1,000 a week during any period of delay. A delays completion for ten days. If $1,000 a week is unreasonable in the light of both the anticipated and actual loss, A's promise to pay $1,000 a week is, in spite of its form, a term providing for a penalty and

is unenforceable on grounds of public policy.

Restatement (Second) of Contracts: Liquidated Damages and Penalties § 356 cmt. c, illus. 5 (1981).

Paragraph I.A of the Resourcing Agreement is like the foregoing example described in the Restatement, and so the penalty analysis applies to it. Looking to the substance of the Resourcing Agreement, therefore, the Court concludes that, even though the $16,667 per day payment clause might be characterized as an alternative performance, or a (negative) "incentive," it is unenforceable under Michigan law if it is a penalty.

◼ Under Michigan law, "[w]hether [a liquidated damage] clause [is] a valid and enforceable one for stipulated damages, or [is] invalid as a penalty . . . is a question of law and there is no need for an inquiry into the intent of the parties." *Moore v. St. Clair County*, 120 Mich.App. 335, 328 N.W.2d 47, 49 (1982); *UAW–GM Human Res. Ctr. v. KSL Recreation Corp.*, 228 Mich.App. 486, 579 N.W.2d 411, 421 (1998)("Whether . . . a [liquidated damages provision] is valid and enforceable or invalid as a penalty is a question of law.")(relying on *Moore*, 328 N.W.2d at 49).

◼ Based on the undisputed facts, and considering the relevant factors, the Court concludes that the amount of the $16,667 per day payment obligation is plainly not "reasonable." This payment provision is therefore unenforceable under Michigan law.

### 1. The Anticipated or Actual Harm.

First, the undisputed evidence in the record supports only the conclusion that $16,667 per day was significantly higher than any loss Exemplar anticipated it would suffer due to a delay by Lear in resourcing. This dollar amount bore no

relationship whatsoever to any actual loss Exemplar expected to suffer or did suffer if Lear failed to complete resourcing on or before November 7, 2002.

It is undisputed that the $16,667 per day rate was agreed to based on a representation that Exemplar made during negotiations, that Exemplar was losing $500,000 per month in producing the wire harnesses for the GM 357 Program at its Empalme facilities. However, contrary to this representation, Exemplar did not believe at the time that it was losing anywhere near $500,000 per month.[20] And Exemplar did not arrive at the figure of $16,667 per day (which was based on the figure of $500,000 per month) by attempting to estimate the actual losses it would suffer if there was a delay in resourcing by Lear. Rather, Exemplar's $500,000 figure was just an effort to fix a sum large enough to give Lear a powerful "incentive" to complete resourcing by November 7, 2002. When asked: "Was the $16,667 an estimate of the amount that Exemplar was losing on the GM 357 Program on a daily basis?," Gordon Schreur, who was designated to testify on Exemplar's behalf, answered: "I do not believe that was the purpose of that amount."[21] And when asked again: "Was the $500,000 number of which $16,667 is one-thirtieth, is that an estimate of the amount that Exemplar was losing on a monthly basis running the GM 357 Program?," Schreur responded:

It's not an estimate that I remember ever giving anyone on the loss incurred each month on [the GM 357 Program].

My recollection of that 500,000 was that I was asked whether it would be a financial incentive for Lear to resource as quickly as possible. I replied back after looking at it that it would be.[22]

In recollecting the origin of the $500,00 figure, Schreur stated:

Joe [Fischer] explained the possibility of the [R]esourcing [A]greement, said that there would be an amount in there that would be a daily charge to Lear if they weren't out of Empalme by a certain date. We wanted to make sure the amount was such it would induce Lear to resource as quickly as possible. He told me what the amount was. I either responded back to him on that call or on a subsequent call. I thought that amount would be such that Lear would have an economic reason to resource as quickly as they could.[23]

The undisputed evidence further shows that, at the time of entering into the Resourcing Agreement, Exemplar knew that the $500,000 per month figure was much higher than what it was actually losing on the GM 357 Program, and thus, much higher than what it anticipated it would lose if GM did not timely complete resourcing. On September 12, 2002, Alix Partners, Exemplar's financial consultant, prepared a "Proposed Term Sheet" for Lear, which included information regarding a price increase for the GM 357 Program based on the projection that "Exemplar would lose $1,240,000 annually under current unit prices."[24] Based on

---

**20.** (*See, e.g.,* Schreur Dep. Tr. at 40, lns. 10–11 ("I'm not aware of anyone requesting or attempting to make [a] calculation [of the negative economic impact for Exemplar of Lear not completing resourcing of the GM 357 Program on or before November 7, 2002]."), 80 lns. 4–6 ("I do not remember there ever being any specific calculation that was able to historically say okay, we lost X amount during any period of time.").)

**21.** (Schreur Dep. Tr. at 85 lns. 19–20.)

**22.** (*Id.* at 85 lns. 16–25, 86 lns. 1–5.)

**23.** (*Id.* at 84 lns. 18–25, 85 lns. 1–3.)

**24.** (*See* Ex. 3 to Lear's Mot. For Summ. J.)

the $1,240,000 figure, Exemplar's monthly losses from continuing to produce wire harnesses for the GM 357 Program were anticipated to be $103,333.33 per month. One thirtieth of this amount is $3,444.44 per day, which is roughly one-fifth of the $16,667 per day figure in the Resourcing Agreement. Given this disparity, the $16,667 figure is unreasonably high when measured against Exemplar's own estimate of actual damages.

The $16,667 per day amount required under the Resourcing Agreement is also unreasonable viewed in hindsight, given the losses Exemplar actually suffered due to Lear's 16–day delay in resourcing the GM 357 Program. Lear alleges that Exemplar suffered *no* actual loss during the period from November 8, 2002 (the day after resourcing was to be completed by Lear under the Resourcing Agreement) through November 23, 2002 (when Lear completed the resourcing). The evidence in the present record supports Lear's position. For this entire period, Ford was operating Exemplar's Empalme facilities under its contractual right of access. For the production during this period, Ford charged *Lear* for the costs of producing component parts for the GM 357 Program, and *Lear* paid the costs billed to it. Laura Marcero of SRR stated in her affidavit:

> Costs of operating the Empalme plants and the warehouses in Empalme and Tucson during the Access Period were paid by SRR on Ford's behalf (not by Exemplar), then billed to Exemplar's customers. *Exemplar had no costs or expenses concerning or related to the operation of the Empalme plants and the Empalme and Tucson warehouses during the Access Period.* To the best of my knowledge, after October 15, 2002,

Exemplar never again operated the Empalme plants or the Empalme and Tucson warehouses.

\*　　\*　　\*　　\*　　\*　　\*

To the best of my knowledge, all costs of operation of Exemplar's Empalme plants, Empalme and Tuscon warehouses, and the corporate overhead connected with them, were paid by Ford and other Exemplar customers, including Lear, for the entire Access Period. Accordingly, *Exemplar incurred no cost or expense in connection with producing parts during the period November 8 through November 23, 2002, and, in fact, during the entire Access Period from October 15, 2002 through and including December 26, 2002.*[25]

The testimony of Exemplar's Gordon Schreur was consistent with Laura Marcero's affidavit. When asked whether Exemplar paid any of the expenses incurred in operating the Empalme facilities after October 15, 2002, other than the employee costs for two employees, Schreur stated: "I do not believe that they did."[26] Schreur admitted that, other than the costs of two employees, after October 15, 2002, Exemplar did not pay employee costs.[27] He admitted further that, after October 15, 2002, Exemplar no longer paid the "periodic fee" to occupy the Empalme facilities; the costs of any electricity, gas, or water; the costs for new orders of raw materials, the costs of health insurance for employees (other than for two employees) or other kinds of insurance; any other direct costs of operating the Empalme facilities (other than for the Tucson warehouse); or any of the indirect costs of

---

**25.** (Aff. of Laura Marcero at 3 ¶ 12, 5 ¶ 15(emphasis added).)

**26.** (Schreur Dep. Tr. at 55 ln. 22.)

**27.** (*See id.* at 49 lns. 18–25.)

operating the Empalme facilities.[28] Schreur did allege that Exemplar incurred costs at other locations. He stated that SRR had reimbursed Exemplar for some of these costs but that there were some costs that were outstanding and were the subject of a lawsuit by Exemplar against Ford.[29] However, Schreur admitted that none of the outstanding costs could be attributed directly to the GM 357 Program.[30] Shreur could not specifically identify any direct or indirect costs of operating the Empalme facilities or any other facility at any other location which could be attributed to the GM 357 Program after October 15, 2002.

Although Exemplar argues that it suffered actual losses due to Lear's delay in resourcing, it has failed to identify or quantify any actual loss or to produce any documents showing any actual losses suffered due to Lear's delay in resourcing. Lear asked Exemplar to identify its actual damages through interrogatories and in depositions, and, in response, Lear only identified the loss it suffered due to Lear's failure to pay to Exemplar the $16,667 per day payment under the Resourcing Agreement.[31] Likewise, the Court questioned Exemplar at the motion hearing about what actual damages Exemplar suffered due to the resourcing delay. Again, Exemplar stated only that it lost the agreed $16,667 per day contract rate.

The only clue that Exemplar gives as to any actual loss it suffered from Lear's resourcing delay are statements it makes in its brief opposing Lear's motion for summary judgment. There, Exemplar states that Ford is currently suing Plaintiffs and that part of the damages Ford is seeking from Exemplar "would be attributable to Lear production."[32] However, Exemplar makes these bare allegations without providing any explanation, and without producing any evidence on how any damages Ford is seeking from Exemplar can be attributed to Lear's delay in resourcing the GM 357 Program. In light of the Affidavit of Laura Marcero, in which she states that Lear was billed for and paid all costs of Ford producing parts for Lear, Exemplar's bare allegation of loss due to Ford's lawsuit is not sufficient to create a genuine issue of material fact.

Thus, there is no evidence in the record that Exemplar suffered *any* actual damages after October 15, 2002 that can be attributed to Lear's delay in resourcing the GM 357 Program. Given this, the $16,667 per day rate charged Lear in the Resourcing Agreement is plainly unreasonable.

28. (*See id.* at 52 lns. 13–20, 53 lns. 3–7, 54 lns. 2–9 and 20–24, 55 lns. 24–25, 56 lns. 1–4, 61 lns. 4–5.)

29. (*See id.* at 61 lns. 6–18.)

30. (*See id.* at 61 lns. 19–25.)

31. (*See, e.g.,* Pls.' Amended Response to Def.'s First Set of Interrogatories at Answer to Interrogatory No.4.) In response to Lear's Interrogatory No. 4 (which stated: "Itemize and show how you calculate any damages claimed by you in this action, whether economic, non-economic punitive or other"), Exemplar responded:

> Pursuant to the GM 357 Resourcing Agreement, if Defendant failed to complete the resourcing of the GM 357 Program on or before November 7, 2002, then for each day after November 7, 2002, until the date the GM 357 Program resourcing was completed, Defendant was required to pay $16,667 per day. Defendant failed to complete the resourcing of the GM 357 Program until November 23, 2002. As a result Defendant owes $266,672 representing $16,667 per day for the dates November 8 through November 23, 2002.
> *Id.*

32. (Pls.' Br. In Opposition to Lear Corporation's Mot. For Summ. J. at 8 ¶ B, C, 12.)

## 2. Difficulty in Proving Actual Damages

The second factor to consider under the UCC "reasonableness" test is the difficulty in proving the actual amount of damages for a breach. There is no evidence that it would be difficult for Exemplar to prove the actual damages that would arise if Lear failed to complete resourcing by November 7, 2002. Presumably, the damages from any delay by Lear in resourcing would be the losses Exemplar would continue to suffer in producing parts for the GM 357 Program. Calculating profit or loss from producing parts is a function performed every day by companies in the automotive industry. And this type of analysis was already performed by professionals Exemplar employed before Exemplar executed the Resourcing Agreement. On September 12, 2002, Alix Partners, Exemplar's financial consultant, prepared a "Proposed Term Sheet" based on an analysis it had performed on the costs of producing parts for the GM 357 Program, which projected that "Exemplar would lose $1,240,000 annually under the current prices." [33] Also, Exemplar's Schreur admitted that Exemplar was aware of "various methods to allocate the cost" of operations for producing component parts among the various customers of Exemplar. [34]

## 3. "[T]he inconvenience or nonfeasiblity of otherwise obtaining an adequate remedy."

The third factor to consider under the UCC "reasonableness" test is "the inconvenience or nonfeasiblity of otherwise obtaining an adequate remedy." There is no evidence in the record that would support a conclusion that the $16,667 per day payment was necessary because it was "inconvenient" or "unfeasible" for Exemplar to "otherwise obtain an adequate remedy" for Lear's delay in resourcing. Thus, this factor further supports the Court's conclusion that the $16,667 per day charge is unreasonable and unenforceable under Mich. Comp. Laws Ann. § 440.2718.

This per day payment provision is also unreasonable and void as a penalty under Michigan common law. The undisputed evidence shows that in successfully proposing the $16,667 per day figure in Paragraph I.A, Exemplar ignored the "just compensation" principle. As explained more fully above, Exemplar did not intend for that payment amount to be just compensation for actual damages it was likely to sustain. And although not conclusive, Exemplar's representative, Schreur, even characterized this provision as a penalty in his deposition: "I had conversations with Lear personnel where we did make sure that they were aware of the clause that there was a $16,000 penalty per day for staying." [35]

Based on the undisputed evidence, Paragraph I.A is a penalty provision and is unenforceable as a matter of law under Michigan law. Lear is therefore entitled to summary judgment on Count I of the complaint. [36]

---

33. (Lear's Mot. For Summ. J. at Ex. 3.)

34. (*See* Schreur Dep. Tr. at 62 lns. 6–18.)

35. (Schreur Dep. Tr. at 72 lns. 23–25.)

36. Because the Court has found that Lear is entitled to summary judgment based on Paragraph I.A being an unenforceable penalty provision, it is unnecessary to discuss Lear's other arguments for summary judgment on Count I, namely, that (1) due to Ford's exercise of its Right of Access under the Access and Security Agreement on October 15, 2002, Ford, not Exemplar, was producing parts for Lear and thus Lear effectively completed resourcing on October 15, 2002; and (2) with regard to ET & B, that ET & B cannot be liable for any alleged breach of the Resourc-

## C. Count II of Plaintiffs' Adversary Complaint.

Lear also seeks summary judgment on Count II of Plaintiffs' complaint. In Count II, Plaintiffs seek the same relief as in Count I—*i.e.*, $266,676 in damages ($16,-667 per day from November 8, 2002 through November 23, 2002, the date on which Lear completed its resourcing of the GM 357 Program), based on a theory of promissory estoppel.

■ Under Michigan law, the elements of promissory estoppel are (1) a promise; (2) the promissor reasonably expected the promise to induce the promisee or a third person to act or refrain from acting; (3) the promissee or a third person were induced to act or refrain from acting by the promise, and (4) injustice can be avoided only by enforcing the promise. *State Bank of Standish v. Curry*, 442 Mich. 76, 500 N.W.2d 104, 107 (1993); *see also Crown Tech. Park v. D & N Bank, FSB*, 242 Mich.App. 538, 619 N.W.2d 66, 71 (2000).

Under Plaintiffs' theory, the "promise" to be enforced is the one Lear made in Paragraph I.A of the Resourcing Agreement, to pay $16,677 per day for Lear's delay in resourcing. Lear argues for summary judgment saying that (1) Plaintiffs cannot prove all of the elements of a prima facie case of promissory estoppel; and (2) Plaintiffs' breach of contract claim precludes them from pursuing relief under a promissory estoppel theory. Lear argues that there is no evidence of the second, third, or fourth elements of promissory estoppel. Lear argues that Plaintiffs have failed to articulate any action by Plaintiffs that was induced by Lear's promise to pay the $16,667 per day rate, and have not produced any evidence of any actual dam-

ages suffered because of Lear's delay in resourcing the GM 357 Program. According to Lear, it follows that Plaintiffs have produced no evidence that would support a finding that Lear's promise must be enforced to prevent an injustice.[37]

Exemplar argues that "there is a genuine issue of material fact as to whether Lear's promise to pay must be enforced to prevent injustice." Exemplar admits that it has taken the position that the Resourcing Agreement is enforceable, but argues that this does not preclude it from arguing, in the alternative, for relief under a promissory estoppel theory. Exemplar also argues that because it is undisputed that ET & B is not a party to the Resourcing Agreement, Plaintiffs are not precluded by that agreement from seeking relief under a promissory estoppel theory. Exemplar alleges that "there is a genuine issue of material fact as to the promises made to ET & B." Finally, Exemplar argues that even if Lear's promise to pay $16,667 per day was only made to Exemplar, "promissory estoppel applies to a promise which induces action on the part of a third party." Exemplar argues that Lear's promise to pay induced ET & B, which was operating Exemplar's Empalme facility, to cooperate with Lear in its resourcing efforts and that ET & B suffered damages as a result of such cooperation.

■ The Court must grant summary judgment for Lear. First, a promise in an express contract that is unenforceable because it constitutes a penalty is likewise unenforceable under a promissory estoppel theory. Promissory estoppel is an equitable doctrine and equity requires that, consistent with the principle of just compensation under Michigan contract law, damages incurred as a result of a breach of promise

ing Agreement because it was not a party to that agreement.

**37.** (*Id.*)

720

be compensatory, not punitive. The Court has concluded that the $16,667 per day payment provision in the Resourcing Agreement is unenforceable because it is a penalty. This precludes Plaintiffs from recovering this amount under a promissory estoppel theory.

 Similarly, it is clear that Plaintiffs cannot satisfy the final element of their promissory estoppel claim—that injustice can be avoided only by enforcement of Lear's promise to pay $16,667 per day. Plaintiffs have not alleged or shown that they incurred actual damages approaching anywhere near the amount of $266,676 because of Lear's delay in resourcing the GM 357 Program. They cannot show, consistent with the principle of just compensation for loss suffered as a result of a breach, that injustice can be avoided only by Lear paying them $266,676. As the court in *Joerger v. Gordon Food Service, Inc.*, 224 Mich.App. 167, 568 N.W.2d 365, 369 (1997) explained:

> In a promissory estoppel action, the "remedy granted for breach may be limited as justice requires." *State Bank of Standish v. Curry*, 442 Mich. 76, 83, 500 N.W.2d 104 (1993), quoting 1 Restatement Contracts, 2d, § 90, p. 242. The guiding principle in determining an appropriate measure of damages is to ensure that the promisee is compensated for the loss suffered to the extent of the promisee's reliance. *Cyberchron Corp. v. Calldata Systems Development, Inc.*, 47 F.3d 39, 46 (C.A.2, 1995); *Mahoney v. Delaware McDonald's Corp.*, 770 F.2d 123, 127–128 (C.A.8, 1985).

## IV. Conclusion.

For the reasons stated, Lear is entitled to summary judgment on both Count I (Breach of Contract) and Count II (Promissory Estoppel) of Plaintiffs' adversary complaint, and the Court must deny Exemplar's motion for summary judgment. The $16,677 per day payment provision in the Resourcing Agreement is unenforceable under any theory. The Court notes, however, that at the motion hearing, Lear agreed that Exemplar is entitled to any actual damages it can show for Lear's delay in resourcing. The Court will give Plaintiffs the opportunity to amend their complaint to allege a claim for such actual damages. The Court will enter a separate order.