NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0393n.06

No. 20-1858

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

<table>
<tr><td>AVERTEST, LLC, dba Averhealth,</td><td>)</td><td rowspan="11"></td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>    Plaintiff-Appellant,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>v.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>LIVINGSTON COUNTY, MICHIGAN,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>    Defendant-Appellee.</td><td>)</td></tr>
</table>

**FILED**
Aug 20, 2021
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

BEFORE: ROGERS, WHITE, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. When negotiating a service contract, a business might engage in costly preparatory work so that it can start providing the services if the contract comes to fruition. But who should pay for this work if the parties ultimately cannot agree on a formal written contract? This case should make one thing clear for such a business: Without the written contract, it will generally bear the risk of loss for the preparatory costs unless it has obtained an unwritten agreement covering all material terms or at least some type of definite promise from the other side.

Avertest, LLC, which goes by "Averhealth," conducts drug and alcohol testing. It sought to contract with a Michigan county for testing services. After a county employee indicated that the county had "approved" Averhealth's proposed testing location and would send a contract in the "near future," Averhealth signed a pricey lease for this location. But the county had second thoughts about the relationship five days into Averhealth's testing and ended the deal without ever signing a contract. Averhealth sued, alleging breach-of-contract and promissory-estoppel claims.

Averhealth is right that Michigan contract law sometimes enforces an unwritten agreement even when the parties contemplate (but fail to sign) a written one. Yet the parties must have agreed on all of the material terms, such that the anticipated written contract represented a mere record of an agreement already reached elsewhere. Here, however, no reasonable jury could find that the parties had agreed to all material terms despite their failing to execute the written contract.

Averhealth is also right that Michigan promissory-estoppel law sometimes permits a party to enforce another entity's noncontractual promise when the party acts in reasonable reliance on it. But the promise must have been clear and definite. And the county's promise that a "contract" would come in the "future" left too many of the promised terms unknown for a reasonable jury to find this element met. We thus affirm the grant of summary judgment to the county.

I

Livingston County sits a short distance to the northwest of Detroit, Michigan. Its courts often require defendants and probationers to take drug and alcohol tests. In early April 2018, county employees issued a "Request for Proposals" asking vendors to propose plans to provide this testing. The county expected a vendor to offer testing at the vendor's location during business hours and to have staff on hand for emergency testing at the courthouse. Under a section entitled "Required Types of Tests," the Request for Proposals indicated that a vendor must perform "GC/MS" confirmation testing (we take the acronym to mean gas chromatography/mass spectrometry). It also anticipated that the parties would enter into a "fully executed contract" before the vendor would perform any work and noted that the contents of both the Request for Proposals and the winning proposal would "become contractual obligations if a contract ensues." RFP, R.25-2, PageID 132. The county sought to have the testing start on June 2, 2018. It requested a 16-month term from that date until September 30, 2019.

Livingston County told vendors to submit any questions about its request by April 23. The county posted its answers a day later. One vendor had asked if the county would accept "LC-MS/MS" confirmation testing (we take this acronym to mean liquid chromatography/mass spectrometry). The county responded that "GC/MS is the federal standard and is the preferred confirmation method." Resp., R.25-2, PageID 146.

Averhealth provides drug and alcohol testing to over 1,000 courts in about 20 states. It submitted a proposal to Livingston County. Averhealth's proposal tied its testing price to the number of tests that Livingston County ordered; the price decreased as the tests increased. The proposal, for example, suggested a price of $21 per test if the county ordered 1,000 tests per month and a price of $12.50 per test if it ordered 2,000 tests per month. The proposal also suggested that Averhealth would perform a "standard confirmation test" without identifying the type.

Livingston County selected Averhealth as a finalist and interviewed the company in early May. During the interview, Averhealth identified two possible locations for its testing site. One was only a half mile from the courthouse. After interviewing the finalists, county employees recommended to the Livingston County Board of Commissioners that the county pick Averhealth.

On May 21, the Board adopted a resolution authorizing the county to enter into a contract with Averhealth at specified pricing for the period from June 2, 2018 to September 30, 2018. The proposed pricing had been amended upward so that Averhealth's basic test would cost $19.25 if the county ordered 2,000 tests per month. The resolution authorized the Board's chairman to sign all contracts and amendments.

The next day, Averhealth hit a snag. It could not finalize its lease at the location near the courthouse. County employees expressed concern with this development. They had selected Averhealth based on this location's convenience and the company's assurances that it could start

3

testing on June 2. Sara Applegate, the county's court programs liaison, had also already emailed court officials about the transition to Averhealth and the (now incorrect) new location.

Averhealth quickly identified a new building about a mile from the courthouse and told the county that this change would not affect its start date. The company agreed to terms with the building's owner on May 24. It did not want to sign a lease, however, without further assurances from the county. In an email to Applegate, Averhealth's CEO indicated: "Before executing the lease, we need approval on the location and the contract from Livingston County." Email, R.29-10, PageID 493. Averhealth asked for the county's approval and the contract by the next day so that it could start preparing the location for the June 2 start date. Applegate responded the next day: "Per our conversation today, we are approving the new location and have attached the resolution to show that it was approved and a contract will follow in the near future." Email, R.25-14, PageID 232. Averhealth entered into a five-year lease.

Averhealth began providing testing services on June 2. Disputes between the parties emerged in early June. County employees at some point became concerned that Averhealth was performing LC-MS/MS (not GC/MS) confirmation testing. These employees also sought a price of $10 for a specific type of test, not the $19.95 that the parties had agreed to for Averhealth's more comprehensive test. Lastly, many test-takers immediately began complaining about the invasive nature of Averhealth's testing.

By June 5, Applegate informed Averhealth that the county was uncomfortable sending individuals to the company until the parties could work through various issues and finalize a contract. Two days later, another county employee told Averhealth that the county would "*not* be contracting with Averhealth for drug testing services." Email, R.25-11, PageID 223. This email explained that the Request for Proposals had required GC/MS testing, but Averhealth used LC-

MS/MS testing. It identified this problem among "several other inaccuracies, concerns and inabilities to meet our needs" as the reason for ending the deal. *Id.* The county directed Averhealth to send a bill for the testing since June 2.

Averhealth sent the county a bill for $112,547.99. This amount included $1,741.25 in testing costs (for testing and transportation of samples). It also included about $86,000 in costs for acquiring and constructing the testing location and $23,000 in costs for training employees. The county paid Averhealth only $1,741.25 for the tests.

Averhealth sued. It alleged breach-of-contract and promissory-estoppel claims, among others. The district court granted summary judgment to the county. *Avertest, LLC v. Livingston County*, 2020 WL 4437458, at *9 (E.D. Mich. Aug. 3, 2020). It held that the parties never entered into a contract and that the Board of Commissioners' resolution only allowed its chairman to do so. *Id.* at *5–6. It next rejected Averhealth's equitable claims, including its promissory-estoppel claim. The court reasoned that Applegate's email approving the testing location acknowledged that the parties had not agreed to a contract, so Averhealth could not rely on this email to believe that they had done so. *Id.* at *8.

II

Averhealth challenges the dismissal of its breach-of-contract and promissory-estoppel claims. We review the district court's decision de novo, applying the Michigan law that governs this dispute. *See Sroka v. Wal-Mart Stores East, LP*, 785 F. App'x 324, 328 (6th Cir. 2019).

A. Breach of Contract

Averhealth argues that Livingston County breached the parties' contract. This claim faces an obvious obstacle: The company cannot identify a traditional "contract" in which the parties incorporated all of their agreed-upon terms into a written document signed by both sides. Not only

that, the Request for Proposals anticipated that the parties would execute such a formal contract. Averhealth nevertheless argues that a genuine dispute of fact exists over whether the parties' interactions in May and June 2018 created an *unwritten* contract.

Averhealth's argument is at least possible under Michigan contract law. Parties who have reached an unwritten agreement may form a binding contract even when they anticipated (but failed to complete) a "written memorial" of the agreement in a formal document. *Scholnick's Importers-Clothiers, Inc. v. Lent*, 343 N.W.2d 249, 253 (Mich. Ct. App. 1983); *see Remark, LLC v. Adell Broad. Corp.*, 702 F.3d 280, 283 (6th Cir. 2012); Restatement (Second) of Contracts § 27 (Am. L. Inst. 1981). For this rule to apply, however, the parties must have agreed on all of the material terms, such that the contemplated written document was designed merely to memorialize the terms that they had already accepted. No binding contract exists if some of those terms remained disputed when one party decided not to go through with the written agreement. *See Pro. Facilities Corp. v. Marks*, 131 N.W.2d 60, 63 (Mich. 1964); *Cent. Warehouse Operations, Inc. v. Riffel*, 2015 WL 1314634, at *4 (Mich. Ct. App. Mar. 24, 2015) (per curiam).

Yet Averhealth's argument fails on the facts. No reasonable jury could find that the parties entered into an "express agreement" on all material terms. *Remark*, 702 F.3d at 284 (quoting Restatement (Second) of Contracts § 27 cmt. c). A few examples prove the point.

*What were the agreed-upon prices?* As late as June 1, the day before Averhealth started testing, the parties continued to negotiate the price. The county sought a price of $10 for a specific type of test, not the $19.95 standard price for Averhealth's comprehensive test. Averhealth responded that it could provide the specific test but for $19.95. That price, the county complained, would cause probation officers to send probationers to other testing agencies. If the probation officers did so, Averhealth rejoined, its prices might increase because the standard price depended

on the quantity ordered. On June 2, Averhealth proposed a "call to discuss possible solutions" to this disagreement, but no evidence suggests that the parties resolved it. Email, R.25-6, PageID 203. This price negotiation belies the claim that the parties made an unwritten contract covering all material terms.

In response, Averhealth argues that a jury could find that the county's $10 price request was an attempt to *amend* a pricing agreement that the parties had reached when the Board of Commissioners authorized the county to contract with Averhealth. The Board's resolution approved entering into a contract at the "attached rates" included in a memo accompanying the resolution. But that memo did not identify a single price. It expressed "uncertainty" over the county's testing volume and proposed different prices for different quantities (such as $19.25 for 2,000 monthly tests). It also did not even list the price that the parties later identified as the default ($19.95) during their June negotiations. Besides, the Board's resolution did not itself "accept" any particular contract terms. It merely authorized county employees to negotiate within the resolution's general parameters and gave the chairman authority to execute a final contract containing the specific terms.

*What quantity of tests did the county agree to send Averhealth?* Neither the Request for Proposals nor the later negotiations stated that the parties were entering into an exclusive relationship or agreeing to a minimum number of monthly tests. A county employee even told Averhealth that probation officers might send probationers to other testing agencies if Averhealth did not reduce its prices—a warning that would make no sense if the parties contemplated an exclusive deal. Averhealth's response to this warning also did not suggest that competition from other testing agencies would breach any contract term. If, however, the parties did not agree to an

exclusive relationship or a minimum quantity, the county would have had every right to stop sending tests to Averhealth at any time.

*What kind of tests would Averhealth perform?* The Request for Proposals required vendors to provide GC/MS confirmation testing, but Averhealth offers LC-MS/MS confirmation testing. Emails from June show the county raising concerns about the LC-MS/MS testing. This dispute also disproves an agreement on all material terms.

Averhealth responds that a jury could find that the county had agreed to LC-MS/MS testing in May before raising complaints in June. During the bidding process, an unidentified vendor asked whether the county would accept LC-MS/MS testing, and the county responded by calling GC/MS the "preferred" (not required) method. Resp., R.25-2, PageID 146. In addition, when Sara Applegate emailed court officials in May announcing the change to Averhealth, she attached Averhealth's sheet of frequently asked questions. In this sheet, Averhealth noted, among other things, that its "confirmation testing is conducted via LC-MS/MS." Email, R.29-2, PageID 446. Averhealth relies on this sheet to prove that it brought the testing issue to the county's attention and that the county consented to the nonpreferred method before later objecting to it.

This evidence, however, would not allow a reasonable jury to conclude that Livingston County affirmatively accepted as a contract term that Averhealth would perform LC-MS/MS confirmation testing. If Averhealth had forthrightly flagged this issue for the county during the negotiations, it could have easily presented that evidence. Yet Averhealth offers no affidavits from employees explaining how or when it informed the county that it would undertake a type of confirmation testing different from the one listed as a requirement in the Request for Proposals. Averhealth's proposal was, at best, misleading on the point. The proposal stated the Averhealth "provides all of the 'Required Types of Drug Test' services" listed on the specific page of the

Request for Proposals that required GC/MS testing and noted later that it would perform only a "standard confirmation test." Likewise, Averhealth's slide presentation during the interview with the county did not mention LC-MS/MS testing. Averhealth also introduced no emails from the county "approving" this testing like the email it received approving the location change. A jury would have to engage in rank speculation to find that the county consented to its unpreferred testing method based on a document attached to an internal county email that was not part of the parties' negotiations. *See K.V.G. Props., Inc. v. Westfield Ins. Co.*, 900 F.3d 818, 823 (6th Cir. 2018).

*What was the contract's length?* The Request for Proposals suggested that it would run for 16 months from June 2, 2018 to September 30, 2019. Yet the Board's resolution authorized the county to enter into an agreement that ran for only 4 months from June to September 2018. Although Averhealth calls the Board's 4-month term a "typographical error," it points to no evidence in which any county agent later accepted any particular term, let alone the longer one. In addition, the Request for Proposals made clear that the county could "terminate this contract at any time" with 30 days' written notice if it found the vendor's work unsatisfactory. RFP, R.25-2, PageID 132. Averhealth does not say whether this opt-out provision made it into the unwritten contract that it claims exists.

*What about the other terms?* The Request for Proposals included "many details." Restatement (Second) of Contracts § 27 cmt. c. It required the vendor to agree to an indemnification clause holding the county harmless for damages caused by the vendor's agents. It barred the vendor from discriminating against its employees on the basis of identified traits. It prohibited the vendor from subcontracting any work without permission. It mandated that the vendor obtain several types of insurance. And it anticipated that the vendor would perform its work "in compliance with the negotiated contract," RFP, R.25-2, PageID 132, suggesting that a

9

formal agreement was itself a material term. *Cf. Farrow Grp., Inc. v. Detroit Land Bank Auth.*, 2019 WL 2194972, at *2 (Mich. Ct. App. May 21, 2019) (per curiam). As these terms show, the parties were contemplating a "complex" deal requiring more than a standard-form contract. *Remark*, 702 F.3d at 284. One would objectively expect this type of deal to be "put in writing[.]" Restatement (Second) of Contracts § 27 cmt. c. The nature of the deal further rebuts any claim that a jury could use an email snippet here or a phone conversation there to fill in all of the terms of an unwritten agreement. *See Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 816 (7th Cir. 1987).

All of this leaves one fact that does support Averhealth. Averhealth did not just take "action in preparation for performance during the negotiations" (it signed the lease and prepared the testing location); it also provided services for a few days in June. Restatement (Second) of Contracts § 27 cmt. c. But the county paid for all testing performed. And Averhealth signed the lease knowing that it had yet to enter into a long-term contract. That is why it requested to see a contract before signing it. Apart from accepting the proposed location, however, Applegate responded by saying the contract would follow later. Thus, rather than demanding an executed contract before signing the lease, Averhealth took the risk that the parties would complete the formal deal later. They never did. And too many material terms are in dispute to allow a reasonable jury to find that the parties had entered into any long-term unwritten contract. *See Pro. Facilities Corp.*, 131 N.W.2d at 63.

### B. Promissory Estoppel

Even assuming the parties did not form a contract, Averhealth alternatively argues, Livingston County should at least be on the hook for Averhealth's costs in setting up its testing site under a promissory-estoppel theory. Promissory estoppel permits one party to enforce a promise made by another party even when the promise did not generate a binding contract under

the usual contract-law rules. *See State Bank of Standish v. Curry*, 500 N.W.2d 104, 107 (Mich. 1993); Restatement (Second) of Contracts § 90(1). To ensure that this equitable doctrine does not effectively eliminate the normal legal elements for a contract, however, Michigan courts apply it with caution. *See, e.g.*, *Bodnar v. St. John Providence, Inc.*, 933 N.W.2d 363, 377 (Mich. Ct. App. 2019); *Barber v. SMH (US), Inc.*, 509 N.W.2d 791, 797 (Mich. Ct. App. 1993) (per curiam).

A Michigan plaintiff must prove four elements. *See Leila Hosp. & Health Ctr. v. Xonics Med. Sys., Inc.*, 948 F.2d 271, 275 (6th Cir. 1991); *Farrow Grp., Inc. v. Detroit Land Bank Auth.*, 2021 WL 70649, at *5 (Mich. Ct. App. Jan. 7, 2021) (per curiam). The defendant must have made a promise (a bank, for example, might promise to lend funds to farmers). *See State Bank of Standish*, 500 N.W.2d at 106, 110. The defendant next must have reasonably expected that the plaintiff would take an action in reliance on this promise (the bank's conversations with the farmers, for example, should have led it to expect that its promised loan would induce them to keep the farm rather than apply for a government buyout). *See id.* at 106, 110–11. The plaintiff must actually take the detrimental action (the farmers, for example, must have opted to keep the farm because of the bank's promise). *See id.* Lastly, given that estoppel is an equitable doctrine, enforcement of the promise must be necessary to avoid an "injustice" (such as the farmers' predicament caused by the bank's later refusal to lend the money). *See id.*

This case concerns the "promise" element. Because Michigan courts cautiously apply promissory estoppel, they have held that not just any "promise" will do. Rather, the doctrine applies only if the defendant has made a "clear and definite" promise. *State Bank of Standish*, 500 N.W.2d at 108; *DBI Invs., LLC v. Blavin*, 617 F. App'x 374, 385–86 (6th Cir. 2015). As one treatise puts it, the promise must be "sufficiently specific so that the judiciary can understand the obligation assumed and enforce the promise according to its terms." 28 Am. Jur. 2d *Estoppel and*

*Waiver* § 52, Westlaw (database updated Aug. 2021); *see McMath v. Ford Motor Co.*, 259 N.W.2d 140, 142–43 (Mich. Ct. App. 1977) (per curiam). Michigan courts thus will not enforce vague or general promises that require speculation about the promiser's actual duties under the promise. *See State Bank of Standish*, 500 N.W.2d at 108–09; *McMath*, 259 N.W.2d at 142–43.

A comparison of *State Bank of Standish* and *McMath* illustrates the divide between clear and opaque promises. In *State Bank of Standish*, the Michigan Supreme Court held that a bank's promise to enter into a loan could be "sufficiently clear and definite" if the court could identify the "material terms of the loan," including such things as the loan amount and interest rate. 500 N.W.2d at 109–10. Yet the court clarified that these terms need not be expressed in the promise itself; they can be established by all of the parties' actions and statements. *Id.* So when the bank repeatedly lent funds to the borrowers on the same basic terms, the court held that a reasonable jury could objectively conclude that the terms of the promised future loan matched the terms from the parties' "previous course of dealing[.]" *Id.* at 110.

In *McMath*, by contrast, the Michigan Court of Appeals held that promises lacking "the required specificity" cannot support an estoppel claim. 259 N.W.2d at 143. There, a pilot who worked for both a private company and the military opted to resign from the military when the company promoted him to chief pilot. *Id.* at 141. Because he lost income from the decision, he decided to resign only after receiving the company's assurances that it "would take care of him" and ameliorate any future economic concerns. *Id.* When the company later fired him, he brought a promissory-estoppel claim. *Id.* at 142. The court rejected the claim because the company's vague promises were not "definite enough" to justify any reliance on them. *Id.* at 143.

Which side of this line does Livingston County's alleged promise fall? It is closer to the one in *McMath* than in *State Bank of Standish*. Recall that when Averhealth asked for a contract

before signing the lease, Applegate responded: "Per our conversation today, we are approving the new location and have attached the resolution to show that it was approved and a contract will follow in the near future." Email, R.25-14, PageID 232. Averhealth argues that Applegate's email "*promised* that a written contract 'will follow in the near future'" and that it relied on this statement. Reply Br. 19. But the suggestion that the county would send a contract in the future did not include "the required specificity" for a reasonable jury to find that the county made an actionable promise. *McMath*, 259 N.W.2d at 143. As the Michigan Supreme Court has explained, a promise of a future contract is insufficiently specific if the "material terms of the agreement are lacking[.]" *State Bank of Standish*, 500 N.W.2d at 108 (citation omitted). And Applegate's email said nothing about those terms (apart from the testing location).

Indeed, Applegate's general promise of a future contract is nearly identical to a promise that the Michigan Court of Appeals has already rejected in a surprisingly similar case. *See Farrow*, 2021 WL 70649, at *4–6. In *Farrow*, a municipal agency issued a request for proposals to demolish dilapidated homes, and the plaintiff demolition company alleged that it had proposed the winning bid. *Id.* at *1. The municipal agency later indicated that the agency would need to issue another round of bidding. *Id.* But it did so only after the demolition company had bought some $700,000 worth of equipment in preparation. *Id.* The company claimed that it relied on promises from the agency when buying this equipment. *Id.* at *5. An agency employee allegedly told the company that it should "procure the necessary equipment," that it should "'gear up' to start the work," and that the contracts "would be coming next week." *Id.* *Farrow* held that these statements could not support a promissory-estoppel claim, reasoning that they did "not constitute a clear and definite promise." *Id.* If the employee's general assurance of a future contract did not suffice in *Farrow*, Applegate's general assurance of a future contract cannot suffice in this case.

13

Unlike in *State Bank of Standish*, moreover, we cannot fill in the gaps of Applegate's generic promise using the parties' other statements or conduct—at least not in a way that is anything but "speculative." *McMath*, 259 N.W.2d at 142 (citation omitted). The parties, for example, had no prior course of dealing, so we cannot objectively identify the terms of the promised contract based on the terms of prior contracts. *State Bank of Standish*, 500 N.W.2d at 110. The parties' negotiations also left too many contract terms a mystery. Would the promised contract require Averhealth to perform LC-MS/MS or GC/MS confirmation testing? Would it run for 4 months or 16 months? Would the testing price be a constant $19.95 or could some tests cost $10? As explained, the record does not answer these questions. *Cf. United States ex rel. Guzall v. City of Romulus*, 743 F. App'x 574, 583 (6th Cir. 2018).

Considering the issue from a slightly different perspective reaffirms this point. The requirement that a promise be clear and definite is necessary to allow courts to answer whether the plaintiff could have reasonably relied on it. *See State Bank of Standish*, 500 N.W.2d at 107–08; *E. Sav. Bank v. Monroe Bank & Tr.*, 2002 WL 31941034, at *7 (Mich. Ct. App. Nov. 26, 2002) (per curiam). In this case, for example, suppose that the parties planned to enter into an exclusive relationship. If that term were impliedly within Applegate's promise, perhaps it may have been reasonable for Averhealth to rely on the promise when signing a five-year lease. Suppose instead that the parties intended to allow the county to withdraw from the contract at any time. If that term were impliedly within Applegate's promise, Averhealth's reliance on an "at-will" relationship as the basis for signing the lease looks a lot more unreasonable. *Cf. Tyler v. Tsurumi (Am.), Inc.*, 425 F. App'x 702, 705 (10th Cir. 2011). Yet how can we answer this reliance question if we do not even know the basic outlines of the alleged promise? *See McMath*, 259 N.W.2d at 143.

In sum, Averhealth took a risk that its relationship with the county would blossom into a multiyear collaboration providing a steady stream of tests (and revenue). That the relationship did not pan out as planned provides no basis to shift its costs to the county on this record.

We affirm.

HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part. I agree that the district court properly granted summary judgment to Livingston County on Averhealth's breach-of-contract claim because the RFP provided that a written contract was necessary, but no written contract was executed. *See, e.g.*, *Farrow Grp., Inc. v. Detroit Land Bank Auth.*, No. 341822, 2019 WL 2194972, at *2 (Mich. Ct. App. May 21, 2019) (per curiam) (affirming summary disposition on a breach-of-contract claim "because the RFP clearly indicated that a written contract would have to be entered into" but "no contract was entered into"). However, because a reasonable jury could find that Averhealth's reliance on Sara Applegate's promise of a forthcoming contract was reasonable, I would reverse the grant of summary judgment on Averhealth's promissory-estoppel claim.

As the majority explains, promissory estoppel has four elements: (1) a clear and definite promise, which (2) the promisor should have reasonably expected the promisee to act on, (3) the promisee did in fact rely on, and (4) must be enforced to avoid injustice. *See State Bank of Standish v. Curry*, 500 N.W.2d 104, 106-07 (Mich. 1993). Given the facts in this case, viewed in the light most favorable to Averhealth, a reasonable jury could find that the promise was sufficiently definite and that Averhealth reasonably relied on that promise to its detriment.

The context of the promise is important. The parties were preparing for the commencement of testing services on June 2—a date set in the RFP and emphasized in discussions between the parties as critical to the County. On May 18, Applegate, the County's main point of contact for Averhealth, confirmed via email that she had "distributed letters to all specialty court probation officers" informing them that they should send participants to Averhealth as of June 2. R. 29-2, PID 445. On May 21, the Livingston County Board of Commissioners adopted a resolution authorizing the County to contract with Averhealth at its proposed prices, with testing to begin on

16

June 2. On May 23, after Averhealth's initial testing location fell through, Averhealth proposed a new location and stated that the "change will not delay the June 2 start date." R. 29-9, PID 488. After not receiving a response, Averhealth sent another email on May 24 stating that it had reached an agreement for another testing location but that it needed approval and the contract before it would sign the lease. The next day, just eight days before commencement of testing, Applegate responded: "Per our conversation today, we are approving the new location and have attached the resolution to show that it was approved and a contract will follow in the near future." R. 29-11, PID 498. She also requested "a copy of the lease agreement once it [was] signed" so she could "let everyone know about the new testing location." *Id.*

Given this context, I disagree with the majority that the promise was not sufficiently definite or that reliance on this promise was unreasonable. In reaching the opposite conclusion, the majority concludes that there were too many unresolved material terms for the promise to be definite. At the time the promise was made, however, none of these disputes had materialized, and a jury could find that Averhealth reasonably believed based on the communications between the parties that all material terms had been agreed upon.

Livingston County argued that there were disagreements regarding some essential terms, citing the type of confirmation testing (GC/MS vs. LC-MS/MS), pricing, and Averhealth's testing procedures. Regarding the type of confirmation testing, the RFP stated that GC/MS was required, but during the bidding process, in response to a question asking specifically whether LC-MS/MS was acceptable, the County merely indicated a preference for GC/MS. Further, on May 18, prior to the Board approving a contract with Averhealth, Applegate distributed information about Averhealth to court officials, which stated that Averhealth provided LC-MS/MS confirmation testing. Three days later, the Board approved a contract with Averhealth. Because County officials

17

were aware that Averhealth would use LC-MS/MS testing before the Board approved a contract with Averhealth, a reasonable jury could conclude that there was agreement as to this term.

For the testing prices, the Board approved a contract with Averhealth "at the attached rates," rates which set a price for a ten-panel test plus certain specialty tests based on the volume of tests per month. R. 29-4, PID 451. Livingston County points to a dispute about a standalone price for one of the included specialty tests, which it raised seven days after Applegate's promise that a contract was forthcoming. There is no indication in the record that this issue had been raised before, and Averhealth's price proposal, approved by the Board, explained that it offered a single price point for a defined set of tests, and its perspective on the cost benefits of pricing its services in this manner. Nor is there any evidence that certain testing procedures employed by Averhealth—procedures that were questioned only after Averhealth began providing services to the County—were in dispute prior to services commencing. Thus, a reasonable jury could find that these terms were agreed upon at the time Applegate made her promise.

I would not rely on other terms cited by the majority (i.e., quantity of tests, contract length, indemnification, insurance, discrimination, and subcontracting) because these terms were not raised by Livingston County in its summary-judgment motion.[1] Although it may be appropriate to decide an issue not raised below in some instances, I would not do so when the record is incomplete or the result is unclear. In this case, neither party provided enough evidence to decide other issues. Rather, the parties appeared to include only as much evidence as necessary to support the specific factual statements and arguments it made in its briefing (sometimes, as the district court noted, failing even to do that). Aside from the bid documents, we have only a few pages from two deposition transcripts and a handful of emails to fill in the gaps about the parties'

---

[1] In any event, most of these terms are dictated by the RFP, and there is no indication that any of these terms that were set forth in the RFP were unacceptable to Averhealth.

18

communications. And it is apparent from those materials that there were further discussions between the parties about which this record sheds little light. Rather than use both parties' omissions against Averhealth, as the majority does, I would allow the district court and the parties to address these issues in the first instance. *See In re Oakland Physicians Med. Ctr., LLC*, 836 F. App'x 342, 348 n.4 (6th Cir. 2020) ("Had Simon specifically raised these issues in his summary-judgment briefing, the parties may have been able to flesh out these issues by submitting additional portions of deposition transcripts, or it would have alerted Singhal of the necessity to gather further evidence, if available, to address these issues.").

The majority's reliance on *Farrow Group, Inc. v. Detroit Land Bank Authority*, 2021 WL 70649 (Mich. Ct. App. Jan. 7, 2021) (per curiam), to support its conclusion that Applegate's promise was insufficiently definite is misplaced. The court in *Farrow* explained, as the majority highlights, that statements made by an agency employee that the plaintiff, Farrow, should "procure the necessary equipment," should "gear up to start the work," and that another employee was "working on the contracts" that "would be coming next week," were insufficiently definite on their own. *Id.* at *5 (internal quotation marks omitted). The court held, however, that these statements in addition to evidence that the agency "awarded the demolition work to Farrow on the basis of Farrow's particular bid (as evidenced by the entries in the [agency]-managed database), and prevented Farrow from lodging any new bids as a result of having been awarded the demolition work at issue," would allow "[a] jury [to] find . . . that [the agency] had promised to give the demolition work to Farrow, the terms of which could be objectively determined from the nature of the accepted bid and the allegedly customary practices of awarding work packages through the [agency]-managed database." *Id.* at *6. A reasonable jury could conclude similarly here based on

the terms of the RFP, Averhealth's proposal, the Board's resolution authorizing a contract with Averhealth at specified prices, and Applegate's assurance that a contract was forthcoming.

The court in *Farrow*, however, affirmed the grant of summary disposition (in this case, what federal courts would call a motion to dismiss) against Farrow on its promissory-estoppel claim because Farrow should have known that a contract was still pending due to the fact that "the RFP clearly outlined the process necessary to formalize an accepted bid into a contract" and that several steps needed to be completed before a contract could be finalized, including formal issuances of notices to proceed on the demolition sites. *Id.* at *6. The circumstances here are distinguishable. As Averhealth argues, it is unclear what, if any, additional steps needed to occur prior to issuance of a contract. There is no testimony indicating whether the Board needed to further sign off on the written contract, and Averhealth reasonably argues that the Resolution approving a contract with Averhealth merely required the ministerial task of the Board Chairman signing a contract containing the terms approved by the Board. This interpretation is backed up by Applegate's instructing Averhealth to sign a lease and instructing probation departments to begin sending test-takers there on June 2. And as discussed above, by the time Averhealth began expending substantial sums of money to perform by June 2, which was a mere eight days after Applegate told Averhealth to secure the lease, none of the disputes about the terms of the contract had arisen. In contrast, in *Farrow*, there is no indication that the start date for the contracts was imminent and no indication that anyone at the agency specifically instructed the plaintiff to purchase the more than $700,000 worth of equipment it claimed as reliance damages.

In sum, although the more prudent course for Averhealth would have been to insist on a written contract before binding itself to a lease and expending a substantial sum of money in preparatory costs, a reasonable jury could find that Averhealth's reliance here was reasonable.

I would therefore reverse and remand on the promissory-estoppel claim to allow a jury to make that determination.

Finally, I agree with the majority that certain terms in the RFP make some of the reliance damages Averhealth claims appear unreasonable. Most problematically, the RFP provided that the County had the right to terminate the contract "at any time, with a minimum thirty (30) days written notice to the vendor in the event that the services of vendor are deemed by the County to be unsatisfactory, or upon failure to perform any of the terms and conditions contained in this agreement." R. 25-2, PID 132. Signing a five-year lease under these circumstances is likely unreasonable, but that does not mean that Averhealth is entitled to none of its reliance damages. I would allow the jury to make that determination as well.